# COLORADO *v.* SPRING

No. 85–1517.   Argued December 9, 1986—Decided January 27, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 577.

*Maureen Phelan*, Assistant Attorney General of Colorado, argued the cause for petitioner. With her on the briefs were *Duane Woodard*, Attorney General, *Charles B. Howe*, Deputy Attorney General, and *Richard H. Forman*, Solicitor General.

*Lawrence S. Robbins* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were

*Solicitor General Fried, Assistant Attorney General Trott, Deputy Solicitor General Bryson,* and *Andrew J. Pincus.*

*Seth J. Benezra* argued the cause for respondent. With him on the brief were *Margaret L. O'Leary, Thomas M. Van Cleave III,* and *David F. Vela.**

JUSTICE POWELL delivered the opinion of the Court.

In *Miranda* v. *Arizona,* 384 U. S. 436 (1966), the Court held that a suspect's waiver of the Fifth Amendment privilege against self-incrimination is valid only if it is made voluntarily, knowingly, and intelligently. *Id.,* at 444. This case presents the question whether the suspect's awareness of all the crimes about which he may be questioned is relevant to determining the validity of his decision to waive the Fifth Amendment privilege.

I

In February 1979, respondent John Leroy Spring and a companion shot and killed Donald Walker during a hunting trip in Colorado. Shortly thereafter, an informant told agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF) that Spring was engaged in the interstate transportation of stolen firearms. The informant also told the agents that Spring had discussed his participation in the Colorado killing. At the time the ATF agents received this information, Walker's body had not been found and the police had received no report of his disappearance. Based on the information received from the informant relating to the firearms violations, the ATF agents set up an undercover operation to purchase firearms from Spring. On March 30, 1979, ATF agents arrested Spring in Kansas City, Missouri, during the undercover purchase.

*\*Saskia A. Jordan* filed a brief for the Colorado Criminal Defense Bar, Inc., as *amicus curiae* urging affirmance.

*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, John K. Van de Kamp,* Attorney General of California, *David Crump, Daniel B. Hales, William C. Summers,* and *Jack E. Yelverton* filed a brief for the State of California et al. as *amici curiae.*

An ATF agent on the scene of the arrest advised Spring of his *Miranda* rights.[1]  Spring was advised of his *Miranda* rights a second time after he was transported to the ATF office in Kansas City.  At the ATF office, the agents also advised Spring that he had the right to stop the questioning at any time or to stop the questioning until the presence of an attorney could be secured.  Spring then signed a written form stating that he understood and waived his rights, and that he was willing to make a statement and answer questions.

ATF agents first questioned Spring about the firearms transactions that led to his arrest.  They then asked Spring if he had a criminal record.  He admitted that he had a juvenile record for shooting his aunt when he was 10 years old.  The agents asked if Spring had ever shot anyone else.  Spring ducked his head and mumbled, "I shot another guy once."  The agents asked Spring if he had ever been to Colorado.  Spring said no.  The agents asked Spring whether he had shot a man named Walker in Colorado and thrown his body into a snowbank.  Spring paused and then ducked his head again and said no.  The interview ended at this point.

On May 26, 1979, Colorado law enforcement officials visited Spring while he was in jail in Kansas City pursuant to his arrest on the firearms offenses.  The officers gave Spring the *Miranda* warnings, and Spring again signed a written form indicating that he understood his rights and was willing to waive them.  The officers informed Spring that they wanted to question him about the Colorado homicide.  Spring indicated that he "wanted to get it off his chest."  In an interview that lasted approximately 1½ hours, Spring confessed to the Colorado murder.  During that time, Spring

---

[1] Under this Court's decision in *Miranda* v. *Arizona*, 384 U. S. 436 (1966), prior to a custodial interrogation a criminal suspect must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*, at 444.

talked freely to the officers, did not indicate a desire to terminate the questioning, and never requested counsel. The officers prepared a written statement summarizing the interview. Spring read, edited, and signed the statement.

Spring was charged in Colorado state court with first-degree murder. Spring moved to suppress both statements on the ground that his waiver of *Miranda* rights was invalid. The trial court found that the ATF agents' failure to inform Spring before the March 30 interview that they would question him about the Colorado murder did not affect his waiver of his *Miranda* rights:

> "[T]he questions themselves suggested the topic of inquiry. The questions dealt with 'shooting anyone' and specifically killing a man named Walker and throwing his body in a snowbank in Colorado. The questions were not designed to gather information relating to a subject that was not readily evident or apparent to Spring. Spring had been advised of his right to remain silent, his right to stop answering questions, and to have an Attorney present during interrogation. He did not elect to exercise his right to remain silent or to refuse to answer questions relating to the homicide, nor did he request Counsel during interrogation." App. to Pet. for Cert. 4–A.

Accordingly, the trial court concluded that the March 30 statement should not be suppressed on Fifth Amendment grounds. The trial court, however, subsequently ruled that Spring's statement that he "shot another guy once" was irrelevant, and that the context of the discussion did not support the inference that the statement related to the Walker homicide. For that reason, the March 30 statement was not admitted at Spring's trial. The court concluded that the May 26 statement "was made freely, voluntarily, and intelligently, after [Spring's] being properly and fully advised of his rights, and that the statement should not be suppressed, but should

be admitted in evidence." *Id.*, at 5–A. The May 26 statement was admitted into evidence at trial, and Spring was convicted of first-degree murder.[2]

Spring argued on appeal that his waiver of *Miranda* rights before the March 30 statement was invalid because he was not informed that he would be questioned about the Colorado murder. Although this statement was not introduced at trial, he claimed that its validity was relevant because the May 26 statement that was admitted against him was the illegal "fruit" of the March 30 statement, see *Wong Sun* v. *United States*, 371 U. S. 471 (1963), and therefore should have been suppressed. The Colorado Court of Appeals agreed with Spring, holding that the ATF agents "had a duty to inform Spring that he was a suspect, or to readvise him of his *Miranda* rights, before questioning him about the murder." 671 P. 2d 965, 966 (1983). Because they failed to do so before the March 30 interview, "any waiver of rights in regard to questions designed to elicit information about Walker's death was not given knowingly or intelligently." *Id.*, at 967. The court held that the March 30 statement was inadmissible and that the State had failed to meet its burden of proving that the May 26 statement was not the product of the prior illegal statement. The court reversed Spring's conviction and remanded the case for a new trial, directing that if the State sought to introduce the May 26 statement into evidence, the trial court should determine whether the "taint" of

---

[2] Spring also moved to suppress a third statement made on July 13, 1979, after he had pleaded guilty to the federal firearms offenses and after an information charging him with murder had been issued in Colorado. The Colorado Supreme Court unanimously concluded that the statement should be suppressed because the questioning officials made no effort "to reaffirm Spring's decision to waive his constitutional rights after he declined to answer particular questions." 713 P. 2d 865, 878 (1985). We granted certiorari only on the question whether the second statement should have been admitted into evidence. 476 U. S. 1104 (1986). Accordingly, the admissibility of the third statement is not before us.

the March 30 statement was sufficiently attenuated to allow introduction of the May 26 statement.

The Colorado Supreme Court affirmed the judgment of the Court of Appeals, although its reasoning differed in some respects. 713 P. 2d 865 (1985). The court found:

> "[T]he validity of Spring's waiver of constitutional rights must be determined upon an examination of the totality of the circumstances surrounding the making of the statement to determine if the waiver was voluntary, knowing and intelligent. No one factor is always determinative in that analysis. Whether, and to what extent, a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement is simply one factor in the court's evaluation of the total circumstances, although it may be a major or even a determinative factor in some situations." *Id.*, at 872–873 (citations omitted).

The court concluded:

> "Here, the absence of an advisement to Spring that he would be questioned about the Colorado homicide, and the lack of any basis to conclude that at the time of the execution of the waiver, he reasonably could have expected that the interrogation would extend to that subject, *are* determinative factors in undermining the validity of the waiver." *Id.*, at 874 (emphasis in original).

Justice Erickson, joined by Justice Rovira, dissented as to the resolution of this issue, stating:

> "Law enforcement officers have no duty under *Miranda* to inform a person in custody of all charges being investigated prior to questioning him. All that *Miranda* requires is that the suspect be advised that he has the right to remain silent, that anything he says can and will be used against him in court, that he has the right to consult with a lawyer and to have the lawyer present during interrogation, and that if he cannot afford a law-

yer one will be appointed to represent him." *Id.*, at 880 (citations omitted).

The dissenting justices found "ample evidence to support the trial court's conclusion that Spring waived his *Miranda* rights" and rejected "the majority's conclusion that Spring's waiver of his *Miranda* rights on March 30, 1979 was invalid simply because he was not informed of all matters that would be reviewed when he was questioned by the police." *Id.*, at 881. The court remanded the case for further proceedings consistent with its opinion.

We granted certiorari, 476 U. S. 1104 (1986), to resolve an arguable Circuit conflict[3] and to review the Colorado Supreme Court's determination that a suspect's awareness of the possible subjects of questioning is a relevant and sometimes determinative consideration in assessing whether a waiver of the Fifth Amendment privilege is valid. We now reverse.

## II

There is no dispute that the police obtained the May 26 confession after complete *Miranda* warnings and after informing Spring that he would be questioned about the Colorado homicide. The Colorado Supreme Court nevertheless held that the confession should have been suppressed because it was the illegal "fruit" of the March 30 statement. A confession cannot be "fruit of the poisonous tree" if the tree itself is not

---

[3] The Colorado Supreme Court followed the lead of several Federal Courts of Appeals in holding that a suspect's awareness of the subject matter of the interrogation is one factor to be considered in determining whether a waiver of the Fifth Amendment privilege is valid. *United States* v. *Burger*, 728 F. 2d 140, 141 (CA2 1984); *Carter* v. *Garrison*, 656 F. 2d 68, 70 (CA4 1981) *(per curiam)*, cert. denied, 455 U. S. 952 (1982); *United States* v. *McCrary*, 643 F. 2d 323, 328 (CA5 1981). Other Courts of Appeals have found that a suspect's awareness of the subject matter of interrogation is not a relevant factor in determining the validity of a *Miranda* waiver. *United States* v. *Anderson*, 175 U. S. App. D. C. 75, 77, n. 3, 533 F. 2d 1210, 1212, n. 3 (1976); *United States* v. *Campbell*, 431 F. 2d 97, 99, n. 1 (CA9 1970).

poisonous. Our inquiry, therefore, centers on the validity of the March 30 statement.[4]

## A

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."[5] This privilege "is fully applicable during a period of custodial interrogation." *Miranda* v. *Arizona,* 384 U. S., at 460–461.[6] In *Miranda,* the Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.,* at 467. Accordingly, the Court formulated the now-familiar "procedural safeguards effective to secure the privilege against self-incrimination." *Id.,* at 444. The Court's fundamental aim in designing the *Miranda* warnings was "to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Id.,* at 469.

Consistent with this purpose, a suspect may waive his Fifth Amendment privilege, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.,* at 444. In this case, the law enforcement officials twice informed Spring

---

[4] The State argued for the first time in its petition for rehearing to the Colorado Supreme Court that this Court's decision in *Oregon* v. *Elstad,* 470 U. S. 298 (1985), renders the May 26 statement admissible without regard to the validity of the March 30 waiver. The Colorado Supreme Court noted that the State would be free to make this argument to the trial court on remand. 713 P. 2d, at 876. The question whether our decision in *Oregon* v. *Elstad* provides an independent basis for admitting the May 26 statement therefore is not before us in this case.

[5] This privilege is applicable to the States through the Due Process Clause of the Fourteenth Amendment of the Constitution. *Malloy* v. *Hogan,* 378 U. S. 1 (1964).

[6] The State does not dispute that the statement at issue was obtained during a "custodial interrogation" within the meaning of *Miranda.*

of his Fifth Amendment privilege in precisely the manner specified by *Miranda*. As we have noted, Spring indicated that he understood the enumerated rights and signed a written form expressing his intention to waive his Fifth Amendment privilege. The trial court specifically found that "there was no element of duress or coercion used to induce Spring's statements [on March 30, 1978]." App. to Pet. for Cert. 3–A. Despite the explicit warnings and the finding by the trial court, Spring argues that his March 30 statement was in effect compelled in violation of his Fifth Amendment privilege because he signed the waiver form without being aware that he would be questioned about the Colorado homicide. Spring's argument strains the meaning of compulsion past the breaking point.

**B**

A statement is not "compelled" within the meaning of the Fifth Amendment if an individual "voluntarily, knowingly and intelligently" waives his constitutional privilege. *Miranda* v. *Arizona, supra,* at 444. The inquiry whether a waiver is coerced "has two distinct dimensions." *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986):

> "First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.* (quoting *Fare* v. *Michael C.,* 442 U. S. 707, 725 (1979)).

There is no doubt that Spring's decision to waive his Fifth Amendment privilege was voluntary. He alleges no "coer-

cion of a confession by physical violence or other deliberate means calculated to break [his] will," *Oregon* v. *Elstad,* 470 U. S. 298, 312 (1985), and the trial court found none. His allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion: "the duration and conditions of detention . . . , the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control." *Culombe* v. *Connecticut,* 367 U. S. 568, 602 (1961) (opinion of Frankfurter, J.). Absent evidence that Spring's "will [was] overborne and his capacity for self-determination critically impaired" because of coercive police conduct, *ibid.;* see *Colorado* v. *Connelly,* 479 U. S. 157, 163–164 (1986), his waiver of his Fifth Amendment privilege was voluntary under this Court's decision in *Miranda.*

There also is no doubt that Spring's waiver of his Fifth Amendment privilege was knowingly and intelligently made: that is, that Spring understood that he had the right to remain silent and that anything he said could be used as evidence against him. The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Moran* v. *Burbine, supra,* at 422; *Oregon* v. *Elstad, supra,* at 316–317. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

In this case there is no allegation that Spring failed to understand the basic privilege guaranteed by the Fifth Amendment. Nor is there any allegation that he misunderstood the consequences of speaking freely to the law enforcement officials. In sum, we think that the trial court was indisputably correct in finding that Spring's waiver was made knowingly and intelligently within the meaning of *Miranda*.

## III

### A

Spring relies on this Court's statement in *Miranda* that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will . . . show that the defendant did not voluntarily waive his privilege." 384 U. S., at 476. He contends that the failure to inform him of the potential subjects of interrogation constitutes the police trickery and deception condemned in *Miranda*, thus rendering his waiver of *Miranda* rights invalid. Spring, however, reads this statement in *Miranda* out of context and without due regard to the constitutional privilege the *Miranda* warnings were designed to protect.

We note first that the Colorado courts made no finding of official trickery.[7] In fact, as noted above, the trial court expressly found that "there was no element of duress or coercion used to induce Spring's statements." *Supra*, at 573.

---

[7] The trial court found: "Though it is true that [the ATF agents] did not specifically advise Spring that a part of their interrogation would include questions about the Colorado homicide, the questions themselves suggested the topic of inquiry." App. to Pet. for Cert. 4–A. According to the Colorado Supreme Court, "It is unclear whether Spring was told by the agents that they wanted to question him specifically about the firearms violations for which he was arrested or whether the agents simply began questioning Spring without making any statement concerning the subject matter of the interrogation. What is clear is that the agents did not tell Spring that they were going to ask him questions about the killing of Walker before Spring made his original decision to waive his *Miranda* rights." 713 P. 2d, at 871.

Spring nevertheless insists that the failure of the ATF agents to inform him that he would be questioned about the murder constituted official "trickery" sufficient to invalidate his waiver of his Fifth Amendment privilege, even if the official conduct did not amount to "coercion."  Even assuming that Spring's proposed distinction has merit, we reject his conclusion.  This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today.[8]

Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right — "his right to refuse to answer any question which might incriminate him." *United States* v. *Washington,* 431 U. S. 181, 188 (1977).  "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled." *Ibid.*  We have held that a valid waiver does not require that an individual be informed of all information "useful" in making his decision or all information that "might . . . affec[t] his decision to confess." *Moran* v. *Burbine,* 475 U. S., at 422.  "[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in

---

[8] In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege.  See, *e. g., Lynumn* v. *Illinois,* 372 U. S. 528 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano* v. *New York,* 360 U. S. 315 (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).  In this case, we are not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation and do not reach the question whether a waiver of *Miranda* rights would be valid in such a circumstance.

deciding whether to speak or stand by his rights." *Ibid.*[9]
Here, the additional information could affect only the wisdom
of a *Miranda* waiver, not its essentially voluntary and know-
ing nature.    Accordingly, the failure of the law enforcement
officials to inform Spring of the subject matter of the in-
terrogation could not affect Spring's decision to waive his
Fifth Amendment privilege in a constitutionally significant
manner.

### B

This Court's holding in *Miranda* specifically required that
the police inform a criminal suspect that he has the right to
remain silent and that *anything* he says may be used against
him.    There is no qualification of this broad and explicit
warning.    The warning, as formulated in *Miranda*, conveys
to a suspect the nature of his constitutional privilege and the
consequences of abandoning it.    Accordingly, we hold that a
suspect's awareness of all the possible subjects of questioning
in advance of interrogation is not relevant to determining
whether the suspect voluntarily, knowingly, and intelligently
waived his Fifth Amendment privilege.

### IV

The judgment of the Colorado Supreme Court is reversed,
and the case is remanded for further proceedings not incon-
sistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins,
dissenting.

The Court asserts there is "no doubt" that respondent
Spring's decision to waive his Fifth Amendment privilege

---

[9] Such an extension of *Miranda* would spawn numerous problems of in-
terpretation because any number of factors could affect a suspect's decision
to waive his *Miranda* rights.    The requirement would also vitiate to a
great extent the *Miranda* rule's important "virtue of informing police and
prosecutors with specificity" as to how a pretrial questioning of a suspect
must be conducted.    *Fare* v. *Michael C.*, 442 U. S. 707, 718 (1979).

was voluntarily, knowingly, and intelligently made. *Ante,* at 573 and 574. I agree, however, with the Colorado Supreme Court that a significant doubt exists in the circumstances of this case and thus the State has failed to carry the "heavy burden" recognized in *Miranda* v. *Arizona,* 384 U. S. 436, 475 (1966), for establishing the constitutional validity of Spring's alleged waiver.

Consistent with our prior decisions, the Court acknowledges that a suspect's waiver of fundamental constitutional rights, such as *Miranda*'s protections against self-incrimination during a custodial interrogation, must be examined in light of the " ' "totality of the circumstances." ' " *Ante,* at 573, quoting *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986), in turn quoting *Fare* v. *Michael C.,* 442 U. S. 707, 725 (1979); see also *id.,* at 724–725; *North Carolina* v. *Butler,* 441 U. S. 369, 374–375 (1979); *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938). Nonetheless, the Court proceeds to hold that the specific crimes and topics of investigation known to the interrogating officers before questioning begins are "not relevant" to, and in this case "could not affect," the validity of the suspect's decision to waive his Fifth Amendment privilege. *Ante,* at 577. It seems to me self-evident that a suspect's decision to waive this privilege will necessarily be influenced by his awareness of the scope and seriousness of the matters under investigation.

To attempt to minimize the relevance of such information by saying that it "could affect only the wisdom of" the suspect's waiver, as opposed to the validity of that waiver, ventures an inapposite distinction. *Ibid.* Wisdom and validity in this context are overlapping concepts, as circumstances relevant to assessing the validity of a waiver may also be highly relevant to its wisdom in any given context. Indeed, the admittedly "critical" piece of advice the Court recognizes today—that the suspect be informed that whatever he says may be used as evidence against him—is certainly relevant to the wisdom of any suspect's decision to submit to custodial interrogation without first consulting his lawyer. *Ante,* at

574. The Court offers no principled basis for concluding that this is a relevant factor for determining the validity of a waiver but that, under what it calls a *totality* of the circumstances analysis, a suspect's knowledge of the specific crimes and other topics previously identified for questioning can never be. ·

The Court quotes *Moran* v. *Burbine, supra,* at 422, as holding that "a valid waiver does not require that an individual be informed of *all* information 'useful' in making his decision or *all* information that 'might . . . affec[t] his decision to confess.'" *Ante,* at 576 (emphasis added). Noticeably similar is the Court's holding today: "[A] suspect's awareness of *all* the possible subjects of questioning in advance of interrogation is not relevant to determining" the validity of his waiver. *Ante,* at 577 (emphasis added). This careful phraseology avoids the important question whether the lack of *any* indication of the identified subjects for questioning *is* relevant to determining the validity of the suspect's waiver.

I would include among the relevant factors for consideration whether before waiving his Fifth Amendment rights the suspect was aware, either through the circumstances surrounding his arrest or through a specific advisement from the arresting or interrogating officers, of the crime or crimes he was suspected of committing and about which they intended to ask questions. To hold that such knowledge is relevant would not undermine the "'virtue of informing police and prosecutors with specificity' as to how a pretrial questioning of a suspect must be conducted," *ante,* at 577, n. 9 (quoting *Fare* v. *Michael C., supra,* at 718), nor would it interfere with the use of legitimate interrogation techniques. Indeed, requiring the officers to articulate at a minimum the crime or crimes for which the suspect has been arrested could contribute significantly toward ensuring that the arrest was in fact lawful and the suspect's statement not compelled because of an error at this stage alone, a problem we addressed in *Brown* v. *Illinois,* 422 U. S. 590, 601 (1975), under the

Fourth Amendment on the assumption that the defendant's waiver of his Fifth Amendment rights in that case had been voluntary. See also *Dunaway* v. *New York*, 442 U. S. 200, 217 (1979) (voluntary waiver of *Miranda* warnings is a threshold requirement for Fourth Amendment analysis).

The interrogation tactics utilized in this case demonstrate the relevance of the information Spring did not receive. The agents evidently hoped to obtain from Spring a valid confession to the federal firearms charge for which he was arrested and then parlay this admission into an additional confession of first-degree murder. Spring could not have expected questions about the latter, separate offense when he agreed to waive his rights, as it occurred in a different State and was a violation of state law outside the normal investigative focus of federal Alcohol, Tobacco, and Firearms agents.

"Interrogators describe the point of the first admission as the 'breakthrough' and the 'beachhead,' R. Royal & S. Schutt, The Gentle Art of Interviewing and Interrogation: A Professional Manual and Guide 143 (1976), which once obtained will give them enormous 'tactical advantages,' F. Inbau & J. Reid, Criminal Interrogation and Confessions 82 (2d ed. 1967)." *Oregon* v. *Elstad*, 470 U. S. 298, 328 (1985) (BRENNAN, J., dissenting). The coercive aspects of the psychological ploy intended in this case, when combined with an element of surprise which may far too easily rise to a level of deception,[1] cannot be justified in light of *Miranda*'s strict

---

[1] The Court rejects, for now, the notion that "mere silence" by law enforcement officials may deprive the suspect of information so relevant to his decision to waive his *Miranda* rights as to constitute deception, though it does acknowledge that circumstances can arise in which an affirmative misrepresentation by the officers will invalidate the suspect's waiver. *Ante*, at 576, and n. 8. In *Moran* v. *Burbine*, 475 U. S. 412, 453 (1986), I joined JUSTICE STEVENS' dissenting opinion, which stated that "there can be no constitutional distinction . . . between a deceptive misstatement and the concealment by the police of the critical fact that an attorney retained by the accused or his family has offered assistance . . . ." I would hold the officers' failure in the present case to inform Spring of their intent to ques-

requirements that the suspect's waiver and confession be voluntary, knowing, and intelligent. 384 U. S., at 445–458, 475–476. If a suspect has signed a waiver form with the intention of making a statement regarding a specifically alleged crime, the Court today would hold this waiver valid with respect to questioning about any other crime, regardless of its relation to the charges the suspect believes he will be asked to address. Yet once this waiver is given and the intended statement made, the protections afforded by *Miranda* against the "inherently compelling pressures" of the custodial interrogation, *id.*, at 467, have effectively dissipated. Additional questioning about entirely separate and more serious suspicions of criminal activity can take unfair advantage of the suspect's psychological state, as the unexpected questions cause the compulsive pressures suddenly to reappear. Given this technique of interrogation, a suspect's understanding of the topics planned for questioning is, therefore, at the very least "relevant" to assessing whether his decision to talk to the officers was voluntarily, knowingly, and intelligently made.

Not only is the suspect's awareness of the suspected criminal conduct relevant, its absence may be determinative in a given case. The State's burden of proving that a suspect's waiver was voluntary, knowing, and intelligent is a "heavy" one. *Miranda*, 384 U. S., at 475. We are to " 'indulge every reasonable presumption against waiver' of fundamental constitutional rights" and we shall " 'not presume acquiescence in the loss of fundamental rights.' " *Johnson*,

---

tion him about the Colorado murder equally critical. *Miranda* v. *Arizona*, 384 U. S. 436 (1966), places an especially heavy burden on the State to show that a suspect waived his privilege against self-incrimination: "*[A]ny* evidence that the accused was threatened, *tricked*, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Id.*, at 476 (emphasis added). I would hold that the interrogating officers' preconceived plan in this case to obtain a waiver from Spring with reference to a particular federal offense and then ask about a separate, unrelated state offense precludes the State from carrying that heavy burden.

304 U. S., at 464 (citations omitted); see *Brewer* v. *Williams*, 430 U. S. 387, 404 (1977).  It is reasonable to conclude that, had Spring known of the federal agents' intent to ask questions about a murder unrelated to the offense for which he was arrested, he would not have consented to interrogation without first consulting his attorney.  In this case, I would therefore accept the determination of the Colorado Supreme Court that Spring did not voluntarily, knowingly, and intelligently waive his Fifth Amendment rights.  713 P. 2d 865, 873–874 (1985).[2]

I dissent.

---

[2] Nothing in the Court's decision today precludes the courts of Colorado from interpreting that State's Constitution as independently recognizing a suspect's knowledge of the intended scope of interrogation as a relevant factor for determining whether he validly waived his right against self-incrimination under state law.  See Colo. Const., Art. II, § 18.