972 F.2d 1341
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
David L. ROBINS, Petitioner-Appellant,
v.
Manfred (Fred) MAASS, Superintendent, Oregon State
Penitentiary, Respondent-Appellee.
 No. 91-35726
 United States Court of Appeals, Ninth Circuit.
 Submitted July 10, 1992.*
Decided July 22, 1992.
 
 Before TANG, FERGUSON and DAVID R. THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 David Robins appeals the district court's judgment denying his petition for writ of habeas corpus under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. §§ 1291, 2253, and we affirm.
 
 
 3
 We review de novo the district court's decision to deny Robins' habeas petition. United States v. Popoola, 881 F.2d 811, 812 (9th Cir.1989). The state court's factual findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Hayes v. Kincheloe, 784 F.2d 1434, 1437 (9th Cir.1986). This presumption does not attach, however, to the state court's determination of legal questions or mixed questions of fact and law. Id. The voluntariness of a waiver of the right to remain silent is a mixed question of law and fact that requires de novo review by the federal habeas courts. Terrovona v. Kincheloe, 852 F.2d 424, 428 (9th Cir.1988); Miller v. Fenton, 474 U.S. 104, 112 (1985).
 
 I. Fifth Amendment
 
 4
 Robins contends that his conviction was obtained in violation of his right against self-incrimination.
 
 
 5
 The parties agree that police officer Bell advised Robins of his Miranda rights and Robins then invoked his right to counsel by stating that he "might want to talk to a lawyer."[1] Once a defendant invokes this right, even equivocally, the police are required to cease all questioning except that necessary to clarify the defendant's desire for counsel. United States v. Fouche, 776 F.2d 1398, 1405 (9th Cir.1985). Further interrogation violates the Fifth Amendment unless (1) " '... the accused himself initiates further communication, exchanges, or conversations with the police,' " and (2) the defendant waives his right to have counsel present during the interrogation. Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983) (citation omitted). To be valid, a waiver must be (1) "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) knowing and intelligent, i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." Colorado v. Spring, 479 U.S. 564, 573 (1987) (citations omitted). In determining the validity of a waiver, we examine the "totality of the circumstances surrounding the interrogation." Id.
 
 
 6
 Here, Officer Bell questioned Robins after Robins invoked his right to counsel. Bell's inquiries included both express questioning ("Are you sure you don't really want to talk to us about this?"; "The glove that's in the back of your car there that I started to ask you about, do you know where the other one is?") and its "functional equivalent," statements that he knew were "reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).
 
 
 7
 Robins, however, repeatedly initiated conversation with Bell by asking, "Exactly what is the charge here?" and continuing to inquire about the crime. See Bradshaw, 462 U.S. at 1045-46. Given the totality of the circumstances, Robins also waived his right to counsel by his subsequent statements. Robins' waiver was voluntary; although Robins was nervous and frightened, there is no evidence that his " 'will [was] overborne and his capacity for self-determination critically impaired' because of coercive police conduct." Spring, 479 U.S. at 574. See also Oregon v. Elstad, 470 U.S. 298, 312 (1985). To the contrary, the trial transcript makes clear that Robins was at least as intent on questioning Bell as Bell was on questioning him:
 
 
 8
 A [Officer Bell]: ... [Robins said], "I think I might want to talk to a lawyer. I didn't do anything but I still might want to talk to a lawyer."
 
 
 9
 I said, "Fine."
 
 
 10
 Q: Did you ask him any questions after that point?
 
 
 11
 A: No. No. I can't recall any specific questions that I asked him after that point.
 
 
 12
 Q: You didn't interrogate him about this particular incident?
 
 
 13
 A: No. In fact, at that point when I said fine, at that point I got my handcuffs out and started to tell him he was under arrest.
 
 
 14
 Q: Go ahead. What happened?
 
 
 15
 A: Well, he continued to inquire about the crime and I said, well, okay, I said, "Attempted murder."
 
 
 16
 Q: How--you say he continued to inquire about the crime. How did he do that?
 
 
 17
 A: [H]e said, "Exactly what is the charge here?" I said, "Attempted murder."
 
 
 18
 He just asked me, he said, "What am I being charged with?"
 
 
 19
 I said, "Attempted murder."
 
 
 20
 And ... he said, "Is she accusing me of that?" That was his response to his question--or my answer to his question. I noted that because to the best of my recollection and all during our conversation before this nobody, myself or any other officers there had mentioned that the victim was a female or the nature of the crime involved and only it was a serious felony. No one had mentioned the gender of the potential victim or even in fact there was a victim; that it was a person crime....
 
 
 21
 I said, "Who said anything about she?"
 
 
 22
 He goes, "Well, what is this all about?"
 
 
 23
 Then he--then I said, "Well, a prostitute was stabbed."
 
 
 24
 And he asked me, "How bad was she hurt?"
 
 
 25
 And I told him, ... "You know, we believe that a prostitute was stabbed and nearly died in your car, in that car right there, and she's going to be all right but she was seriously injured and it's very, very likely that she might identify you."
 
 
 26
 I asked him, ... "Are you sure you don't really want to talk to us about this?"
 
 
 27
 I don't really remember what he said. I didn't really ask him anything else after that.
 
 
 28
 I told him about the glove.... I didn't ask him questions but I talked to him. I said, "The glove that's in the back of your car there that I started to ask you about, do you know where the other one is?" And he just kind of looked at me.... I said, "It was dropped in the street where the prostitute was stabbed and we have it and I think it's probably going to match the one in the back of the car."
 
 
 29
 ...
 
 
 30
 Basically, just wanted to give him some food for thought because I put him in the back seat of my car right after that. I handcuffed him, walked him back to the back of the car. He asked me, he says, "Well, how serious is this all, this thing?" I said, "Well, it's a Class A felony."
 
 
 31
 And ... he says, "Is that real bad?"
 
 
 32
 And I told him what the penalty was, that it carried the possibility of 20 years and $100,000 or both if convicted. And he started stuttering really badly. He said, "Does it really have to go to trial? I mean, isn't there something we can do about this?" ... He said, "Well, it's just a prostitute"....
 
 
 33
 Robins' waiver was knowing and intelligent. The trial court found that Robins was advised of his Miranda rights and understood them, and there is no evidence that Robins misunderstood the consequences of speaking freely to the police. Spring, 479 U.S. at 574-75; Elstad, 470 U.S. at 316. Thus, the district court properly concluded that Robins' conviction was not obtained in violation of Fifth Amendment.
 
 II. Effective Assistance of Counsel
 
 34
 Robins contends that his trial counsel was ineffective because she failed to subpoena the psychiatrist who examined him and submitted a report concluding that he was a dangerous offender. He argues that the psychiatrist's testimony should have been impeached on cross-examination. This contention lacks merit.
 
 
 35
 The ineffective assistance of counsel standard comprises two parts.
 
 
 36
 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that a counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 
 
 37
 Strickland v. Washington, 466 U.S. 668, 687 (1984). To establish the first part, the defendant must show that his counsel acted outside the range of professionally competent assistance. Id. at 690. To establish the second part, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.
 
 
 38
 Robins has failed to make either showing. At the sentencing hearing, defense counsel vigorously attacked the psychiatrist's report, arguing that it lacked the specific findings required in order to sentence Robins under the "dangerous offender" statute. The issue, as framed by counsel for both sides and the court, was whether the report contained the necessary findings, not whether psychiatrist's testimony was credible. There is no evidence that defense counsel acted unprofessionally or that cross-examination of the psychiatrist would have produced a different outcome.
 
 CONCLUSION
 
 39
 The district court's judgment is AFFIRMED.
 
 
 
 *
 The members of the panel unanimously agree that this case is appropriate for submission on the briefs and record per Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 It is not clear from the record exactly when Officer Bell told Robins he was under arrest. However, the parties agree that Robins was in custody when he made the statements he later sought to suppress