OPINION OF THE COURT
Michael R. Juviler, J.
This is a written version of an oral decision after a hearing *170 on a motion to suppress a statement by the 14-year-old. defendant to two detectives. The main ground for suppression is the allegation that the defendant’s father, who knew most about the facts of the investigation, was deliberately denied access to his son and misled about his status by police deception, and that even though the defendant’s mother was present when the defendant made his statement, she also had been misled on material facts.
On this hearing, the People have the burden to show the voluntariness of the statement beyond a reasonable doubt, including all of the components of voluntariness set forth in CPL 60.45.
THE FACTS
On November 25, 1991, at the Thomas Jefferson High School in Brooklyn, a shooting incident took place, during which a student, Darryl Sharpe, was killed, and a teacher wounded. (The defendant has been indicted for murder of the student and assault of the teacher.)
Detective Curran questioned Jermaine Bentley, the defendant’s 17-year-old brother, at the precinct regarding this incident. Jermaine Bentley said that the defendant has possessed a gun and fired it.
After Jermaine Bentley gave this statement, Sally Bentley, the mother of the two young men, arrived at the precinct. Detective Curran told her that he had questioned Jermaine about the shooting and he wanted to speak to Jason about it. Curran said that a teacher and a student had been shot and both were at the hospital. Curran knew that Darryl Sharpe already had died.
At that time, the defendant, Jason Bentley, was 14 years of age. He lived at home with his parents. He had never been arrested.
At about 1:15 that afternoon, the defendant, at home, called his father, Rudolph, at a Jewish Center in Queens, where the father worked as a maintenance supervisor. The defendant said that Mrs. Bentley had instructed him to tell his father that the police had been to the Bentley home and had taken Jermaine to the precinct because something had happened in school.
When Rudolph Bentley hung up the phone, other employees told him that they had heard on the radio that a teacher at the Jefferson High School had been hurt and a student killed. *171 The father turned on the radio and soon heard the same report.
As a result, at 1:30 he called his home to speak to Jason again about what had happened at the school. Mrs. Bentley answered the telephone and told Mr. Bentley that the police had brought her back to the home to pick up Jason to take Jason to the precinct. Mr. Bentley said that he had heard on the radio that a teacher had been injured and a student killed at the school.
After this conversation, Rudolph Bentley became uneasy and started to cry. Within two or three minutes, he left his place of work to go to the precinct, to find out what was going on.
About one hour later, at 2:25, Detective Curran spoke to the defendant in an office on the second floor of the precinct, in the presence of Detective Wright and the defendant’s mother. Curran said that he wanted to question Jason about a shooting of a teacher and a student at the school. Mrs. Bentley said that she had heard that somebody had been killed and someone hurt, and she asked about that. Curran answered that somebody was hurt. The impression given by Curran deliberately to Jason and Sally Bentley was that no one had died.
Curran gave the defendant and his mother the complete Miranda warnings, reading them from a card. Mrs. Bentley and the defendant understood the rights as read; they said that the defendant was willing to answer questions.
Curran proceeded to interview Jason Bentley in the presence of Detective Wright and Mrs. Bentley. The defendant said that he had not possessed or fired a gun.
At about this time, 2:30, the defendant’s father arrived at the precinct, before the completion of the defendant’s next statement — the statement that is at issue in this hearing.
Many news reporters were gathered on the first floor. Rudolph Bentley went to a receptionist and told her that his two sons and his wife were there and he wanted to see them. The receptionist made a telephone call and told Rudolph Bentley that in a few minutes he would be able to go upstairs.
It is clear from the subsequent events, and I find, that the receptionist notified Detective White, a colleague of Detectives Curran and Wright in the same detective squad, that Jason Bentley’s father was downstairs, wanting to see him; Detective White, on his own initiative or on instructions from Detective Curran, deliberately kept Rudolph Bentley away, so as not to *172 interrupt an interrogation that was then at a crucial point and to avoid advice to the defendant from Rudolph Bentley or from a lawyer not to say anything more in the homicide investigation.
A few minutes after the receptionist made the phone call, she showed Rudolph Bentley where to go to get to the second floor. Rudolph Bentley went upstairs. At about 2:40, he reached the second floor and saw several people behind a partition. One of them, Detective White, came over. Rudolph Bentley introduced himself and said that he wanted to see his sons and his wife. White responded, "They’re not here, they’re out helping with the investigation.” This was not an inadvertent mistake, but a deliberate falsehood.
White gave Rudolph Bentley a business card with his name and Detective Wright’s name and a telephone number for Rudolph Bentley to call. The father left the precinct and went home.
At about that time, Detective Wright was telling the defendant and his mother that Jermaine had told the police that the defendant had fired a gun in the school. Wright said that it would be "better” if the defendant told "the truth.”
The two detectives then left the defendant and his mother alone for a few minutes. Upon their return, the defendant gave a new statement. At four o’clock, Curran typed it into a DD-5 police report. The defendant and his mother read that report and signed it at the bottom.*
In the course of the afternoon the defendant and his mother did not say that they wanted a lawyer; neither asked to see or speak with the defendant’s father, except to the extent that was already accommodated; no detective informed Mrs. Bentley or the defendant that the defendant’s father was at the precinct or had been there; and Jason and his mother did not know of the father’s arrival.
At five o’clock, Rudolph Bentley watched the television news, including reports of the dramatic homicide at the high school. He telephoned the precinct and asked for Detective White. Sally Bentley came to the telephone. She disclosed that she had been at the precinct all the time. Mr. Bentley rushed to the precinct.
*173 THE LAW ON POLICE DECEPTION AND PARENTAL ACCESS
It is well settled that, at least in connection with interrogation of adults, a considerable amount of deception can be used by the police without rendering a statement inadmissible, although deception is a factor to be considered in the totality of circumstances bearing on the issue of voluntariness. In People v McQueen (18 NY2d 337, 346), a detective told the defendant that she might as well admit what she had done, otherwise the victim would be likely to identify her. At that time, the detective knew that the victim already had died. The statement was admissible.
It is also settled that in giving the Miranda warnings the police do not have to tell the defendant specifically what the police intend to question him about. (Colorado v Spring, 479 US 564.) The Miranda warnings are valid, as long as the defendant is told that "anything” he says may be used against him. That warning was given and understood in this case.
It is also established that statements to a defendant in the nature, "It would be better if you told the truth,” do not automatically render a statement thereafter involuntary. (See, for example, People v Belgenio, 164 AD2d 865; People v Giangrasso, 109 AD2d 750.) In Giangrasso (supra, at 751), an officer told the defendant’s mother that if her son cooperated, " 'maybe something’ ” could be done. This comment was held not to create a substantial risk that the defendant might falsely incriminate himself; therefore, it did not require suppression of his confession. (See, CPL 60.45 [2] [b] [i].) In Belgenio (supra, at 866), the officer told the defendant, " 'maybe * * * we can help you.’ ” In People v Diaz (77 AD2d 523, 528 [Sandier, J., dissenting], affd 54 NY2d 967), the police told the defendant that it could only " 'help’ ” in the long run if he told the truth. People v Caserino (16 NY2d 255, 260) implicitly approved a statement by a police officer that if the defendant told the truth, " 'may be there would be some leniency’ ” shown him.
In addition, confronting a suspect with evidence of his guilt, as was done here, does not render a statement involuntary, but is appropriate police practice. (People v Glasper, 160 AD2d 723.)
What complicates the present case is that these settled principles cannot be applied in isolation from the other facts. One of the defendant’s parents — the one who knew the gravity of the investigation — was deliberately excluded from access to *174 the defendant in order to insure that an incriminating statement was given without interruption or advice, such as by the parent or by a lawyer; and both parents were misled about facts material to a decision whether to advise their son to tell the truth or to remain silent, and whether to get a lawyer before their son said anything else.
The court is not required to reach, and does not reach, the question whether both parents of a juvenile suspect must be given access to their child. The language of the Family Court Act and the Criminal Procedure Law relating to the information given to parents of a juvenile (a suspect under 16) and their presence during questioning does not, on its face, require the presence of both parents in a two-parent family. (See, CPL 140.20 [6]; Family Ct Act § 724 [a], [b] [ii]; § 305.2 [3], [4] [b]; [7], [8].) If these provisions are read literally and mechanically, they are satisfied by the presence of one parent without admitting the other parent to the interrogation room.
Given the facts of this case, however, these statutes must be interpreted here in the light of court rulings relating to the interrogation of juveniles. Although an adult suspect’s parents or other supportive adults may be denied access without consequences to the admissibility of a subsequent statement, the courts have said otherwise for interrogation of minors, even those above the age of juveniles. This development of the common law in New York appears to have begun with Chief Judge Fuld’s opinion in People v Townsend (33 NY2d 37, 41). There, the Court said that "it is impermissible for the police to use a confession, even if it be otherwise voluntary, obtained from a 17-year-old defendant when, in the course of extracting such confession, they have sealed off the most likely avenue by which the assistance of counsel may reach him by means of deception and trickery.” (Supra, at 41.)
Townsend (supra) involved interrogation with no family member present. In this case, one parent was present. But the other parent alone knew the seriousness of the situation, until White misled him about Jason’s role in the investigation and his whereabouts, as Curran and Wright had deceived the defendant’s mother about the student’s death. The actions of Detectives Curran, Wright, and White, in combination, isolated the defendant from "the most likely avenue by which the aid of counsel [might] reach him” — the excluded parent— and they did this by "deception and trickery.” (People v Townsend, supra, at 41.) Whether or not the defendant’s father would have retained counsel, had he been told that his *175 son was being questioned at the police station as a murder suspect, "is beside the point.” (Supra, at 41.)
The special protection given to minors in the Townsend case (supra) has been applied consistently thereafter by the Appellate Division. For example, in People v Pica (159 AD2d 524, 525), the Court held, "When a minor is residing in the home of his parents, 'the police have an obligation to establish and maintain procedures so that the suspect is not deliberately or inadvertently held beyond the reach of his parent[s]’ * * * Conduct aimed at isolating a youthful suspect from his family or other supportive adults will not be tolerated.” (See also, People v Pughe, 163 AD2d 334, 335; People v Rivera, 78 AD2d 556, 557.)
Jason Bentley, unlike the defendants in these cases, was not isolated from all of his family, but the conduct of the three detectives in combination insured that the parent most likely to give him help and access to a lawyer was kept away by deception.
In summary, I am not ruling that as a matter of law in every case both parents must be given access to a defendant who is 14 years old. But if, as in this case, the effect of the police conduct through trickery is to insure that a juvenile offender’s parent with the information necessary for an informed decision whether to obtain a lawyer is kept from access to the child, despite a request by that parent, the police conduct crosses the line that has been drawn by the Court of Appeals and the Appellate Division, even if the other parent is present at the interrogation.
For these reasons, the motion to suppress the statement is granted.

 The parties agreed that this statement not be recounted at the hearing, in case I suppressed it, because the defendant had waived a jury and had asked for a bench trial to follow the Huntley hearing.