
# ARKANSAS COURT OF APPEALS

DIVISION II
No. CR-16-753

RICHARD RAYMOND RESSLER
                                    APPELLANT

V.

STATE OF ARKANSAS
                                    APPELLEE

**Opinion Delivered** April 5, 2017

APPEAL FROM THE CRAIGHEAD COUNTY CIRCUIT COURT, WESTERN DISTRICT
[NO. 16CR-14-898]

HONORABLE VICTOR L. HILL, JUDGE

AFFIRMED

## LARRY D. VAUGHT, Judge

Appellant Richard Ressler appeals his conviction by a Craighead County jury for rape, a Class Y felony. We affirm.

Ressler was charged with raping his daughter. Prior to trial, the court held a hearing on Ressler's motion to suppress evidence. Ressler asked that the court exclude any evidence stemming from statements he gave to law enforcement without having been fully advised of his rights; all evidence stemming from his arrest, which he claimed was made without probable cause and was the product of an improper warrant; and any evidence of pretrial identifications. Jonesboro Police Detective Racy testified that he worked the case and had drafted the arrest warrant based on his separate interviews with the victim and her mother. Racy testified that he searched Ressler's home on Holtom Street and recovered numerous items described to him by Ressler's daughter as having been involved in the sexual assaults. Detective Racy then interviewed Ressler at the Jonesboro Police Department. The detective stated that he read

SLIP OPINION

Ressler the standard rights form and had him initial and sign it. Ressler acknowledged that he understood his rights. The interview was recorded, and the recording was played at the hearing. In it, Ressler states that he understands his *Miranda* rights and has "no problem with this." In the interview, Ressler never said anything directly incriminating, but he did acknowledge that his ex-wife had previously accused him of sexually molesting his daughter. He discussed his history of depression and suicidal thoughts. He stated that he and his daughter had not spoken in months and that her mother had manipulated her into turning against him. The detective also testified that items were taken from Ressler's daughter's home on Pine Street with her permission.

During the suppression hearing, the defense went into detailed questioning about what had been removed from Ressler's daughter's home prior to Ressler's arrest. When challenged as to the relevancy of that line of questioning, the defense argued that it was "trying to show the sequence of what happened," because "it will be our ultimate argument that things acquired prior to the time of the search should be suppressed." The defense then questioned the detective about the timing of the search of Ressler's home, arguing that it had occurred prior to the issuance of the search warrant, which the detective denied (he clarified that the items were removed from Ressler's daughter's home prior to the search warrant being issued and that Ressler may have been arrested prior to the warrant but that no search was conducted of Ressler's home prior to issuance of the warrant). The defense also argued that Ressler's statement to police should be suppressed because he was not notified why he was being detained and questioned and that he was not free to go. The court denied the motion to

suppress, stating that Rules 12.5 and 13 did not require such notice. The State agreed that Ressler's prior convictions would not be mentioned.

During the trial, Sergeant Lane Holmes with the Jonesboro Police Department testified that he was working the desk when Ressler's daughter and her mother came in and stated that they wanted to report a crime. He testified that Ressler's daughter was visibly upset and that it took him a few minutes to calm her down. He testified that Ressler's daughter did most of the talking and that he had both women write out their own statements in their own words. Detective Racy testified that he interviewed Ressler's daughter and her mother separately. He then drafted a probable-cause affidavit based on which a bench warrant was issued for Ressler's arrest.

Detective Racy testified that he arrested Ressler, then he went to Ressler's daughter's home on Pine Street, and with Ressler's daughter's permission, took photos and collected evidence. He then went back to the station and completed a search warrant for Ressler's home. He acknowledged that he had taken photos of Ressler's home when he was previously there to arrest Ressler. The defense objected to the introduction of "any items based on the evidence that was taken from [Ressler's home] or any pictures [Detective Racy] may have taken," which the court denied. The State then admitted into evidence photographs of Ressler's home, including pictures of olive oil in his nightstand and a "The Law of Attraction" CD on a dresser. Detective Racy stated that he did not confiscate those items until later, when he returned with a search warrant. Again, the defense objected, stating only "that is part of the motion to suppress the statement made yesterday, and so we renew our objection," without ever explaining its basis. The court again denied the motion, and the detective testified to the items

he collected from Ressler's home, which included olive oil, "The Law of Attraction" CD, "The Book of Life," and computer components. Detective Racy testified that the purpose of taking those items was to corroborate Ressler's daughter's statements. The court sustained the defense's objection to admitting into evidence a copy of the search warrant but allowed admission of the items obtained from Ressler's home pursuant to the warrant. The recording of Detective Racy's interview of Ressler was played for the jury. Detective Racy testified that he had separately asked both Ressler's daughter and her mother to describe Ressler's penis, which they did, with the mother's description being much more detailed.

Ressler's daughter testified that she was currently nineteen years old, that her father was Richard Ressler, and that her father had full custody of her for much of her childhood. She testified that, during that time, she did not regularly visit her mother, seeing her only once. She testified that, while living with her father, she became estranged from her mother and brother, that her father told her that her mother didn't love her, and that her father would record her conversations with her mother. Her father also started homeschooling her using a computer program and instructed her not to tell her mother. She testified that within the first year of homeschooling, her father stopped grading her work and stopped helping her with it. By eighth grade, she stopped doing the work altogether; she testified that her father knew this. He also refused to allow her to be part of a homeschool group and refused to allow her to go back to public school when she asked to do so. She testified that she "had no social life" and did not get to see anyone. She testified that they "stopped leaving the house altogether" and that she did the cooking and cleaning.

Ressler's daughter testified that her father's sexual abuse began when she was six or seven years old, when he would touch her in the vaginal area over her clothing. She described escalating abuse that involved touching without clothes and bathing together. Even though she took showers alone when at her mother's home, her father insisted that they take baths together. Ressler's daughter testified that, when she was about eight or nine years old, her father began masturbating in front of her, lying naked with her, and touching her genitals. Ressler's daughter testified that he made her read books and watch movies on "The Law of Attraction," and that he told her it would bring him happiness and bliss if he could have sex with her. He also made her perform oral sex on him. She testified that, at about age thirteen or fourteen, he began attempting to have vaginal sex with her, but that it hurt and he would stop momentarily, then try again. She testified that her father purchased sex toys and used them on her and that he used olive oil as a lubricant. She specifically testified that her father had inserted his penis into her vagina. At first he used condoms but then stopped using them. She testified that one time he ejaculated inside of her and was afraid he had gotten her pregnant.

Ressler's daughter also testified that her father told her she could not tell anyone about the abuse, that they wouldn't understand, and that if he was arrested he would kill himself. She testified that he became depressed when he could not have sex with her, so she tried to be quiet and comply, even when it hurt. She testified that he also had her read online stories of father-daughter incest to normalize what he was doing.

Ressler's daughter testified that the abuse stopped when she was sixteen. She testified that her father asked her to drink so much that she would pass out so that he could have sex

with her. She said they drank Captain Morgan rum together and that she remembered throwing up. The next morning, he told her he realized how bad things had gotten, and from that point on they pretended it had never happened. However, during arguments she would bring up how angry she was, and her father would say that if she told the police, he would kill himself. The State introduced Ressler's daughter's journal entries discussing the abuse.

Ressler's daughter testified that she had thought about running away and even started to make plans to move to Florida to live with a boy she had met online, but he had turned out to be an older man. She then decided to move in with her half-brother and his girlfriend when she turned eighteen, which her father agreed to. After moving in with her brother, she told them about the abuse, and they insisted that she tell her mother and go to the police.

The defense played an excerpt of Detective Racy's videotaped interview of Ressler's daughter, in which she describes her father's penis as not having any moles.

At the close of the State's case, the defense moved for directed verdict, arguing that the State had not made a prima facia case of rape because (1) the evidence was only Ressler's daughter's uncorroborated testimony and (2) there was no evidence that Ressler ever completed the act of sexual intercourse. The defense argued that Ressler's daughter's testimony had been only that Ressler had touched her, used sex toys on her, and had attempted to have sex with her, but that there was no proof of penetration. The defense also argued that Ressler's daughter failed to give exact dates for the abuse. The court denied the motion, stating that the testimony had been that Ressler forced her to perform oral sex and had penetrated her vaginally and anally, and such evidence was sufficient under the statute.

The defense then presented the testimony of Ressler's friend Greg Smith, who testified that Ressler's relationship with Ressler's daughter seemed close and happy. He testified that a week before trial, Ressler asked him to take a picture of Ressler's penis, which he did. Smith testified that Ressler's penis had a large mole.

Corey Smith testified that she is the wife of Greg Smith, that she and her family knew Ressler and Ressler's daughter, and that she thought Ressler's daughter "was happy as a lark." She stated that Ressler's daughter never confided in her about sexual abuse.

Phoebe Hutchinson, the daughter of Greg and Corey Smith, testified that she and Ressler's daughter had been friends growing up, that Ressler's daughter seemed happy, and that she had never revealed any abuse.

Ressler testified on his own behalf. He testified to his divorce and custody battle with his wife, which he stated included her filing false charges against him. He denied telling his daughter to lie to her mother about anything. He denied his daughter's allegations about any form of sexual abuse. He claimed that their relationship had deteriorated due to his depression. On cross-examination, he testified that he believed her mother had told her to say these things.

The defense renewed its motion for directed verdict, saying simply that it was "based on the same arguments that were made before," and the court again denied it. The jury found Ressler guilty of rape and sentenced him to thirty years in the Arkansas Department of Correction. Ressler filed a timely appeal.

Although he raises it as his third point on appeal, preservation of Ressler's right to freedom from double jeopardy requires a review of the sufficiency of the evidence prior to a review of trial errors. *Byrum v. State*, 318 Ark. 87, 90, 884 S.W.2d 248, 250 (1994). The test for

determining sufficiency of the evidence is whether there is substantial evidence, direct or circumstantial, to support the verdict. *Jackson v. State*, 2011 Ark. App. 528, at 5–6, 385 S.W.3d 394, 397 (citing *Johnson v. State*, 337 Ark. 196, 201, 987 S.W.2d 694, 697 (1999)). On appeal, we consider only the evidence that supports the verdict, viewing the evidence in the light most favorable to the State. *LeFever v. State*, 91 Ark. App. 86, 89, 208 S.W.3d 812, 815 (2005). Evidence is substantial if it is forceful enough to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture. *Harmon v. State*, 340 Ark. 18, 22, 8 S.W.3d 472, 474 (2000). We do not weigh the evidence presented at trial, as that is a matter for the fact-finder. *Jackson*, 2011 Ark. App. 528, at 5–6, 385 S.W.3d at 397. Witness credibility is an issue for the fact-finder, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence. *LeFever*, 91 Ark. App. at 89, 208 S.W.3d at 815.

Ressler's only sufficiency argument is that "the evidence presented came solely from the alleged victim with no corroborating evidence to sustain the elements of the charge." This argument has no merit. It is well established that the uncorroborated testimony of a victim, even a child, is sufficient to sustain a conviction for rape. *Vance v. State*, 2011 Ark. 392, at 5, 384 S.W.3d 515, 518 (citing *Brown v. State*, 374 Ark. 341, 288 S.W.3d 226 (2008)) ("A rape victim's uncorroborated testimony describing penetration may constitute substantial evidence to sustain a conviction of rape, even when the victim is a child."). Moreover, Detective Racy testified that he photographed and recovered items from Ressler's home that corroborated the victim's story. We hold that there was substantial evidence to support Ressler's conviction and affirm on this point.

SLIP OPINION

Ressler next argues that the court erred in denying his motion to suppress evidence gathered from his daughter's home on Pine Street. As presented in his appellate brief, this argument is undeveloped, unsupported by legal authority, and difficult to follow. We will not reverse when a point on appeal is unsupported by convincing arguments or sufficient citation to legal authority. *Watson v. State*, 2015 Ark. App. 721, at 6, 478 S.W.3d 286, 290. Ressler's daughter consented to the search of her home and the seizure of her property. While Ressler moved to suppress evidence below, he never fully articulated the legal basis for his suppression motion, and he has again failed to do so here. To the extent that he argues on appeal that the search warrant was improperly based on his daughter's hearsay statements to Detective Racy, Ressler never raised that argument below, and it is therefore unpreserved for appellate review. *Williamson v. State*, 2013 Ark. 347, at 9, 429 S.W. 3d 250, 255–56. Moreover, we have previously said that uncorroborated statements by a victim of the alleged crime are sufficient for a warrant to issue. *Wormley v. State*, 2010 Ark. App. 474, at 7–8, 375 S.W.3d 726, 731–32. We affirm on this point.

Ressler's last point on appeal is that the trial court erred in denying his motion to suppress his statements to Detective Racy because, he claims, he was not advised of the specific crime he was suspected of having committed. Again, Ressler cites to no legal authority for this particular argument, instead relying on cases that stand for the well-established rule that it is the State's burden to prove that a statement is voluntary and that a waiver of rights is knowingly and intelligently made. In *Colorado v. Spring,* 479 U.S. 564, 577 (1987), the United States Supreme Court held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect

voluntarily, knowingly, and intelligently waived his" rights. As a result, we have held that there is no legal requirement that a defendant know that he is a suspect in a specific crime before waiving his rights. *Ramirez v. State*, 91 Ark. App. 271, 273–74, 209 S.W.3d 457, 459 (2005). We affirm on this point.

Affirmed.

ABRAMSON and KLAPPENBACH, JJ., agree.

*Terry Goodwin Jones*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.