The STATE of Ohio, Appellee,

v.

STANLEY, Appellant.■

[Cite as *State v. Stanley* (1997), 121 Ohio App.3d 673.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–950392.

Decided June 25, 1997.

674

676

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Susan Laker*, Assistant Prosecuting Attorney, for appellee.

*Cathy R. Cook*, for appellant.

---

HILDEBRANDT, Judge.

### FACTUAL BACKGROUND

Defendant-appellant, Fred Stanley, appeals from the judgment of the Hamilton County Court of Common Pleas entered pursuant to a jury verdict in which appellant was found guilty of the murder of Thelma Beck. Mrs. Beck was found dead in her home on April 9, 1990. She had been stabbed more than ten times, and her throat had been slit. The cause of death was determined to have been massive internal bleeding from one of the stab wounds to her abdomen.

Mrs. Beck had last been seen alive by a neighbor at approximately 8:15 a.m., and other neighbors discovered her body at approximately 9:30 a.m. They immediately called the police. No one saw any other person enter or leave Mrs. Beck's home between 8:15 a.m. and 9:30 a.m.

The Cincinnati Police Department secured and inspected Mrs. Beck's home, and they searched the surrounding area for possible suspects and for the weapon used upon Mrs. Beck. They could find neither. Numerous fingerprint lifts were taken at the scene, and all except two were identified as belonging to persons later eliminated as suspects. The police were unable to identify the remaining two prints at that time.

In 1992, the Cincinnati Police Department began using a Fingerprint Identification System ("FIS"), a computer system which contained images of fingerprints taken by the police in the course of processing a person arrested for a crime. The FIS was capable of matching a print scanned in by an operator to an existing print image and could thereby identify the person who made the scanned print.

Usually, the FIS identified several possible matches, and a fingerprint expert would then compare the unidentified print on the lift with the actual inked print of the matches. This identification process involved matching distinguishing characteristics of both of the prints. When several unique attributes of the prints were identified as being identical, the expert would confirm that the two prints were made by the same person.

In 1992, the unidentified prints from Mrs. Beck's home were scanned into the FIS. The FIS indicated that a print on file matched one of the prints found at the home. A fingerprint expert compared the fingerprint lifts from Mrs. Beck's

home to the inked prints of the person identified by the FIS and found that the prints were indeed made by the same person: appellant Fred Stanley.

The police then went to appellant's home and requested that appellant accompany them to the police station for questioning. Appellant is deaf, mildly retarded and unable to communicate verbally. However, his brother was able to convey the officers' message to appellant through sign language. Appellant agreed to go with the officers.

At the station, Detective Feldhaus attempted to communicate with appellant by writing messages to him. However, it soon became clear to Detective Feldhaus that appellant could neither read nor write competently. Unfamiliar with sign language himself, Detective Feldhaus called Brian Stricker, another Cincinnati Police Officer, who was believed to be able to communicate in sign language.

Officer Stricker arrived at the station and began to "sign" to appellant. After determining for himself that he and appellant were effectively communicating, Officer Stricker signed the *Miranda* warnings to appellant and had appellant put his signature on a form that stated that he had been given the warnings and understood them. Detective Feldhaus then began interrogating appellant through Officer Stricker.

Appellant was shown pictures of the victim and her house, but he initially indicated that he did not recognize the victim or the house. Uncertain that appellant understood what the officers were asking, the officers decided to take appellant to the scene of the crime. Even when appellant was standing in front of the house, he responded in the negative when Officer Stricker asked him if he knew the place or had been there.

While the officers and appellant were in front of the house, a car drove by and someone in the car allegedly called out to appellant. Officer Stricker stated that appellant's demeanor changed after the car drove by. Detective Feldhaus noted where the car stopped and proceeded to question the occupants of the car to see how they were acquainted with appellant. Detective Feldhaus testified that these persons told him that appellant had frequently been in that neighborhood and had, on occasion, performed odd jobs for the victim.

With this information, the officers and appellant returned to the station, where Officer Stricker informed appellant that they knew he was not telling the truth about being at the house. At that point, according to Officer Stricker, appellant confessed to killing the victim, allegedly because of a dispute concerning work he had performed for her.[1]

---

1. The actual details of the dispute are unclear. At the police station, appellant allegedly indicated that the victim became angry with him for watching television when he was

Following further interrogation, the officers decided to videotape their communications with appellant. On tape, Officer Stricker repeated the *Miranda* warnings he had given appellant, and appellant, in sign language, indicated that he understood what Officer Stricker was communicating. Officer Stricker then questioned appellant about the murder. On tape, appellant indicated by a stabbing motion how the victim had been killed, and also indicated by pointing on his body the places where the victim had been stabbed: in the abdomen, the chest, the left leg, and the throat.

Appellant was charged with the murder of Thelma Beck. Because appellant was under the age of eighteen when the crime was committed, he was at first under the jurisdiction of the Hamilton County Juvenile Court. He was then bound over to the common pleas court to be tried as an adult. Because of his indigence, the court appointed an attorney for him.

PROCEDURAL HISTORY

Counsel for appellant notified the trial court that the competency of appellant to stand trial was in question. Appellant was subsequently examined by several medical experts. Following a hearing on March 5, 1993, appellant was found incompetent to stand trial and not restorable to competency within one year. Pursuant to R.C. 2945.38(G),[2] the indictment against appellant was dismissed.

The next item reflected in the record after the dismissal of the original indictment is the reindictment of appellant. The record discloses that on March 19, 1993, the Hamilton County Prosecutor's office reindicted appellant pursuant to R.C. 2945.38(H) for the crime of murder. Counsel for appellant filed a motion to dismiss the indictment, claiming that appellant had been found incompetent and could not be reindicted unless his condition had changed. Acknowledging the reindictment provisions of R.C. 2945.38(H), counsel also argued that the requirements of that statute could not be established by hearsay. Appellant's counsel did not, however, argue that the requisites for reindictment were not met; counsel argued only that the state could not prove that they were met by using hearsay evidence.

---

supposed to be cleaning. She began yelling at him and pushing him, telling him to get out. Appellant then became angry and stabbed her. However, later in the proceedings, a co-inmate of appellant's testified that appellant confessed to him, stating that appellant claimed that the victim refused to pay him for work he had done (walking her dog), and that when he tried to get money from her purse, she began hitting him, and he then stabbed her.

2. The references in this opinion to R.C. Chapter 2945 are to the provisions in effect at the time appellant was being prosecuted. The provisions in R.C. Chapter 2945 have been substantially revised since that time, but the changes do not take effect until July 1, 1997.

Without a record hearing, the trial court denied the motion to dismiss. The court *sua sponte* raised the issue of appellant's competency to stand trial and ordered another hearing on the issue. The transcript of the proceedings indicates that counsel for appellant, counsel for the state, and the trial judge met in the judge's chambers, at which time the trial court considered the motion to dismiss. However, only the results of that meeting (denial of the motion to dismiss the indictment and setting the case for a competency hearing) were made part of the record. No reasons were given for denying the motion to dismiss, and no evidence admitted of what action, if any, was taken by the probate court.

Thus, there is nothing in the record that specifically demonstrates what happened after the trial judge initially found appellant incompetent to stand trial and ordered that "the procedures set forth in Revised Code Section 2945.38(C) shall be instituted."

The second competency hearing was held on May 13, 1993. After this second hearing, the court found that appellant was competent to stand trial. Following a jury trial, appellant was found guilty of murder. When it was discovered that the court bailiff had answered a question regarding the case posed by the jurors during deliberation, appellant moved for and was granted a retrial. The case was reassigned to a different judge.

Counsel for appellant again raised the issue of appellant's competency to stand trial, and the trial court held a third hearing. On December 23, 1994, the court found appellant competent to stand trial. Appellant was again tried for the murder of Thelma Beck, and again a jury returned a guilty verdict. From the judgment entered on this second verdict, appellant now appeals, raising twelve assignments of error. We find no reversible error in this case and affirm the judgment of the trial court.

FIRST ASSIGNMENT OF ERROR

Appellant's first assignment of error concerns the validity of the reindictment after he was initially found incompetent to stand trial:

"The original trial court erred to the prejudice of defendant–appellant by failing to grant defendant–appellant's motion to dismiss indictment."

The record demonstrates that appellant moved the first trial court to dismiss his reindictment, but that motion was denied without a hearing. Appellant again sought to have the indictment dismissed prior to the second trial, but the second trial court concluded that it was bound by the decision of the first trial court on the issue of the validity of the reindictment.

After the first competency hearing on March 5, 1993, the trial court held, "[B]ased upon the evidence that I heard today, I think it is clear to me that Mr. Stanley is not competent to stand trial. * * * All of the experts were again

unanimous on [whether defendant was restorable to competency within one year], and I find he's not able to be made competent within one year." The order entered pursuant to this decision stated that "the procedures set forth in Revised Code Section 2945.38(C) shall be instituted. The Court further ORDERS that the Defendant be detained by the Hamilton County Sheriff until Probate Court accepts jurisdiction, pursuant to O.R.C. Section 2945.38(C)."

■ Appellant advances two arguments in support of this assignment of error. First, appellant claims that he could not be reindicted because the finding of incompetency was the law of the case. Second, appellant contends that the state was required to show a change in appellant's condition before it could institute new proceedings.

■ The initial determination of incompetency in this case does not constitute the "law of the case," as appellant suggests. The law-of-the-case doctrine states that "[t]he decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." *Hubbard v. Sauline* (1996), 74 Ohio St.3d 402, 404, 659 N.E.2d 781, 783. The doctrine requires trial courts to "follow the mandates of the reviewing court." *Id.* A determination of incompetency is not even a final appealable order, *State v. Hunt* (1976), 47 Ohio St.2d 170, 1 O.O.3d 99, 351 N.E.2d 106, and in this case no reviewing court made any determination regarding competency. The law-of-the-case doctrine is inapposite to the situation before the court.

■ We also reject the argument that the state has a burden to show a change in condition before reindictment is proper. In the cases cited by appellant, *State v. Jemison* (1968), 14 Ohio St.2d 47, 43 O.O.2d 115, 236 N.E.2d 538, and *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, the defendants were first found competent to stand trial, but a later suggestion of incompetency was made by their respective counsel.

Neither case addressed the requirements for reindictment, which are statutorily defined in R.C. 2945.38(H). The provisions relating to the defendant's competency to stand trial and the disposition of the case following a determination of incompetency are defined by statute, and we must look to the statute to determine the factors the court must consider in determining competency and the propriety of reindictment.

In this case, the reindictment was proper if the conditions of the statute were met; the state is not required to show more. The record demonstrates that the trial court found appellant incompetent to stand trial and not restorable to competency within one year and intended that the provisions of R.C. 2945.38(C) relating to the institutionalization of appellant take place.

However, as indicated above, the official record in this case does not affirmatively demonstrate what took place at the probate court level. Following the entry of the trial court's finding of incompetency and automatic dismissal of the indictment, the next entry in the record is the reindictment of appellant.

Reindictment of a criminal defendant after a finding that the defendant is not competent to stand trial and not restorable within one year is accomplished pursuant to R.C. 2945.38(H). That section states that the dismissal of the indictment is a bar to further proceedings against the defendant based on the same conduct, unless "an affidavit alleging that the defendant was * * * mentally retarded and subject to * * * institutionalization by court order was filed and the defendant was * * * found * * * mentally retarded and subject to * * * institutionalization by court order, but was later released, or was not so found."

Thus, once found incompetent and not restorable within one year, a defendant cannot be reindicted for the same conduct unless the defendant either was institutionalized and later released *or* was found not to be subject to institutionalization. The burden of proof is on the state to show, by a preponderance of the evidence, that the reindictment was properly instituted. See *State v. Phelps* (1991), 75 Ohio App.3d 573, 600 N.E.2d 329; *State v. Brown* (1981), 2 Ohio App.3d 400, 2 OBR 475, 442 N.E.2d 475; *State v. Davis* (1983), 12 Ohio App.3d 84, 12 OBR 283, 466 N.E.2d 572.

In response to appellant's original motion to dismiss the reindictment, the state submitted a memorandum in opposition that included the following statement:

"The defendant has not asserted that any of the conditions in R.C. 2945.38(H) are present, which would bar reindictment. And in fact, the state is prepared to demonstrate that no bar to reindictment exists. The provisions of R.C. 2945.38 having been satisfied, the state has proceeded to re-indict the defendant for the offense of murder as provided by law."

The state's assertion that none of the provisions in R.C. 2945.38(H) that would bar reindictment existed in this case *was unchallenged* by appellant. At no time did appellant ever indicate that the requirements in the statute for reindictment were not met, or that he was in fact subject to institutionalization. Rather, appellant stated only that the state had not shown a change in appellant's condition and was not permitted to prove the requirements of the statute by hearsay.

In his brief on appeal, appellant again argues that "the State must show that the statutory conditions for reindictment have been met. * * * The demonstration of no probate confinement cannot be made by hearsay. *State v. Davis* (1983), 12 Ohio App.3d 84, 85, [12 OBR 283, 284–285] 466 N.E.2d 572 [574]." In *State v. Davis*, the defendant was reindicted while still hospitalized

and receiving treatment for his mental illness. The state argued that the defendant's status at the hospital had been changed from an involuntary commitment to a voluntary commitment, and that the defendant was therefore "released" from commitment.

The only evidence before the court of the defendant's change in status was a prosecutor's statement that a doctor at the hospital had told him that the defendant was no longer being held involuntarily. The defendant was not present for the hearing. The court in *Davis* held that the hearsay statement was insufficient to prove that the defendant, who was still hospitalized, had been "released." See *id.* at 85, 12 OBR at 284–285, 466 N.E.2d at 574.

First, we note that the decision in *Davis,* although persuasive in cases in which the defendant remains hospitalized but becomes a voluntary patient, is not binding on this court. We believe that the defendant's continued hospitalization in *Davis* distinguishes that case from this one, where appellant appeared in person before the court for his arraignment pursuant to the second indictment. We find *Davis* simply inapposite to this case.

■ We recognize that appellant's motion to dismiss the indictment was denied by the trial court following an in-chambers meeting among the judge, the prosecutor, and defense counsel. Although no record was made of the evidence or testimony presented during the meeting, a reviewing court must presume that the court below applied the law correctly. *State v. Coombs* (1985), 18 Ohio St.3d 123, 18 OBR 153, 480 N.E.2d 414; *State v. Sorrels* (1991), 71 Ohio App.3d 162, 593 N.E.2d 313. Thus, we presume that the trial court found that no bar to reindictment existed. This presumption is supported by our recognition that appellant has never argued that he was institutionalized but not released, that he was subject to institutionalization, or that any defect in the probate court procedure occurred. Appellant was physically present for his reindictment, which would justify the trial court's determination that appellant was released or never institutionalized and supports the presumption that the trial court correctly determined that no bar to reindictment existed.

Based on the foregoing, we overrule appellant's first assignment of error.

SECOND AND THIRD ASSIGNMENTS OF ERROR

■ In his second and third assignments of error, appellant challenges the propriety of the second competency hearing and the finding of competency. Appellant claims that the trial court erred in holding the second competency hearing because the initial finding of incompetency, which included a finding that appellant was not restorable to competency within a year, precluded any subsequent determination of competency unless the state demonstrated a change in appellant's condition.

The statutory provisions regarding competency do not explicitly limit the number of times the issue of competency may be raised. Rather, R.C. 2945.37 states that when a suggestion of incompetency has been made before trial, the court must hold a hearing, and that if the issue is raised after trial has begun, the court must hold a hearing for "good cause" shown.

Significant by its absence is any provision *limiting* the number of hearings that a court may hold to determine competency. Nothing in the statute precludes a court from holding more than one hearing, and, in some cases, the statute specifically provides for more than one hearing. In the cases cited by appellant, *State v. Jemison*, 14 Ohio St.2d 47, 43 O.O.2d 115, 236 N.E.2d 538, and *State v. Chapin*, 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317, the Ohio Supreme Court held that a trial court is not *required* to hold another hearing on competency once the issue has been determined, absent a showing of a change in the defendant's condition. Neither decision stands for the proposition that a court is *prohibited* from holding another hearing upon request. See, *e.g.*, *State v. Manuel* (Feb. 5, 1993), Richland App. No. 92–CA–33, unreported, 1993 WL 48990 (five hearings on competency held; defendant found competent at fifth hearing).

 Moreover, the reindictment of a defendant pursuant to R.C. 2945.38(H) is not merely a *reinstatement* of the prior indictment; the state must institute an entirely separate proceeding, starting with obtaining an indictment from the grand jury. *State v. Brown* (1981), 2 Ohio App.3d 400, 2 OBR 475, 442 N.E.2d 475. This proceeding, if begun in accordance with R.C. 2945.38(H), is instituted and continued as if the earlier indictment had not taken place. As with any newly commenced indictment, the defendant is presumed to be competent to stand trial unless proven otherwise. See R.C. 2945.37(A). Thus, holding the second hearing after the new indictment was not error.

 Because of the nature of a reindictment and the operation of R.C. 2945.37(A), we also reject appellant's argument that the burden of proof in the second hearing should have been on the state to prove that appellant was competent. We again note that under R.C. 2945.37(A), appellant was presumed competent to stand trial unless the evidence proved otherwise. The burden of establishing incompetence to stand trial is upon appellant. See *State v. Williams* (1986), 23 Ohio St.3d 16, 19, 23 OBR 13, 16, 490 N.E.2d 906, 917, citing *State v. Chapin*, 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317; *State v. Bailey* (1992), 90 Ohio App.3d 58, 67, 627 N.E.2d 1078, 1084; *State v. Pruitt* (1984), 18 Ohio App.3d 50, 59, 18 OBR 163, 172–173, 480 N.E.2d 499, 509.

 Appellant also claims that the trial court erred in finding that appellant was competent to stand trial following the second competency hearing. To be considered competent to stand trial, a defendant must be able to under-

stand the nature and objective of the proceedings against him and to participate in his own defense. *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824; R.C. 2945.37(A). In reviewing the lower court's determination of competency, we look at whether the trial court's conclusion was supported by competent, credible evidence. *State v. Williams*, 23 Ohio St.3d at 19, 23 OBR at 16, 490 N.E.2d at 910; *State v. Hicks* (1989), 43 Ohio St.3d 72, 79, 538 N.E.2d 1030, 1038.

At the second hearing, appellant reintroduced the evidence that had been submitted in the first hearing, as well as additional evidence. At the first hearing, appellant presented the testimony of Dr. Nancy Schmidtgoessling, a psychologist at the Court Psychiatric Center; Kathleen Hart, a clinical psychologist and assistant professor at Xavier University; Constance Logan, a clinical psychologist at the Court Psychiatric Center; Gwendolyn Speaks–Trujillo, a licensed independent social worker who formerly worked for the Court Psychiatric Center and who specializes in the assessment of hearing-impaired individuals; and Dr. Emmitt G. Cooper, a psychiatrist in private practice.

Schmidtgoessling, Hart, Logan and Cooper were all stipulated to be experts in the field of psychiatry or psychology. Each of them reviewed appellant's school records and prior tests of his IQ and competency, and each met individually with appellant and interviewed him by using interpreters. Dr. Hart also gave appellant an IQ test using the Leiter International Performance Scale, which is frequently used for hearing-impaired individuals. Speaks–Trujillo did not personally interview appellant for determination of his competency, but she had had personal contact with him when he attended a support group that she initiated for hearing-impaired individuals. She also watched the videotaped interview of appellant with Officer Stricker.

All of the witnesses for appellant stated their opinions that appellant could not understand abstract concepts, that his communication in sign language was extremely low-functioning, and that he did not understand the great majority of what was being communicated to him. Schmidtgoessling, Hart, Logan and Cooper each stated an opinion that appellant could not understand courtroom procedure, the adversarial process, the role that the judge, jury and attorneys played in the courtroom, or the consequences of a conviction.

They also stated that appellant was unable to relate events in an appropriate time sequence, and that he would be unable to communicate with his attorney regarding events that occurred two years prior to his arrest. All opined that appellant was mildly retarded, but that retardation alone did not automatically translate into incompetency; rather, appellant's inability to meaningfully communicate combined with his retardation kept him from comprehending the nature of the proceedings against him and from participating in his defense.

The state put on two witnesses, Officer Stricker and Sally Monohan, a school counselor at St. Rita School for the Deaf and a certified interpreter. Officer Stricker testified that he believed that he had been able to carry on a meaningful conversation with appellant and that appellant's responses to his questions were appropriate (in the sense of being rational and responsive in the context of the questions asked, although not necessarily correct answers). Officer Stricker stated his opinion that appellant was able to relay information in proper chronology.

Monohan did not interview appellant. She and several other instructors at St. Rita's reviewed the videotaped interview of appellant by Officer Stricker. They watched the tape without audio. Monohan testified that she was able to understand Officer Stricker's signs, that appellant appeared also to understand, and that appellant gave appropriate responses to the questions.

At the close of the first hearing, the trial court found appellant incompetent to stand trial based on the unanimous opinions of the psychiatric and psychological experts. The judge indicated that he found significant the fact that the state had been apparently unable to produce any psychiatric or psychological evidence that appellant was competent to stand trial. Since the experts also agreed that appellant was not restorable to competency within a year, the trial court also adopted that finding.

At the second hearing, appellant's witnesses were Dr. McCay Vernon, a psychologist and nationally recognized expert in the psychological examination of hearing-impaired individuals, including assessment of mentally retarded, hearing-impaired individuals; Dr. Carol Everington, a psychologist who had designed a test called the Competence Assessment for Standing Trial for Defendants With Mental Retardation, which has been validated and widely used; Maxine Brown, a certified interpreter; Dr. Laura Kelly, an audiologist; Brenda Williams, one of appellant's former teachers; and Dr. Schmidtgoessling and Ms. Speaks–Trujillo, both of whom also testified at the first hearing.

Vernon is able to communicate in sign language and so communicated with appellant without the need for an interpreter. Vernon evaluated appellant's IQ, performed a test designed to screen for brain damage, conducted a reading comprehension test that had been standardized for deaf individuals, and reviewed appellant's past examinations and test scores. Vernon determined that appellant had suffered brain damage as a result of his premature birth and early illness, and that appellant read on a first-grade level.

Vernon stated an opinion that appellant could not understand abstract concepts in general, and that appellant was unable to understand the specific concepts regarding the trial setting and the different actors involved, or to assist his attorney. He stated that appellant's responses to Officer Stricker's "yes/no"

questions did not accurately reflect appellant's level of comprehension; using an open-ended question format, Vernon determined that appellant was incapable of communicating information back to Vernon in a comprehensible manner.

However, Vernon did state that appellant knew that he had been accused of killing an elderly woman and that killing was wrong. Appellant was able to communicate to Vernon past incidents in his life when he had done something and was punished or scolded for it, and demonstrated an ability to understand when he had done something wrong.

Carol Everington interviewed appellant on two occasions through two interpreters.[3] She assessed appellant's competency by using the test that she had developed, and she reviewed appellant's medical and educational records. By evaluating appellant's intellectual functioning and adaptive behavior, she determined that appellant was mildly retarded. Everington concluded that appellant's performance on the competency evaluation showed that he was well below the suggested cutoff for competency. Additionally, she found by the use of open-ended questions that appellant had little ability to understand the legal process, to work meaningfully with an attorney, or to comprehend the significance of events in the case.

Everington did state that appellant was cooperative in taking the competency evaluation, that he understood the multiple-choice format of the test, and that he could answer some open-ended questions, such as "What does a doctor do?" She stated on cross-examination that appellant was able to adequately communicate that he had been questioned by the police, that he believed the police had tricked him, that he knew he had been charged with murder, and that he knew who his attorney was. Everington denied seeing any signs of malingering or deception.

Maxine Brown, a certified interpreter, was questioned regarding the communication difficulties she experienced when interpreting for doctors examining appellant. She interpreted for a doctor for the state (Tanay) and a doctor for the defense (Schmidtgoessling). Brown stated her opinion that appellant was very low-functioning in sign language, and that although appellant understood some of the questions, "a lot of them he did not."

Appellant also presented the testimony of Dr. Laura Kelly, an audiologist. Kelly stated an opinion that appellant had profound hearing loss, that he could not read, and that he could repeat only short sentences with any proficiency. She

---

**3.** The parties determined fairly early in the case that the use of two interpreters, one hearing-impaired and one not, was the most satisfactory method of communicating with appellant. The examiner would ask a question, the interpreter capable of hearing would sign that question to the hearing-impaired interpreter, and the hearing-impaired interpreter would sign the question to appellant. Responses from appellant would be communicated in the reverse order.

stated that his receptive communication skills were markedly reduced. She described him as cooperative and able to understand the requirements of the audiology test without any appreciable difficulty.

Schmidtgoessling testified again at the second hearing. Schmidtgoessling indicated that she had examined appellant a second time. Although he did respond to her questions, his answers were irrelevant and inconsistent and indicated a misapprehension of the questions she was asking. She stated that he continued to demonstrate difficulty with time sequencing, and that her opinion as to his competency to stand trial had not changed. On cross-examination, she responded that educating appellant about the court process was "plausible."

Williams had worked with appellant during the 1991–1992 school year and had attempted to assist him in finding employment. Initially, appellant was hired by a grocery store to clean, but he was unable to read the directions on the areas to be cleaned and consequently could not follow even simple written directions. He then attempted to perform the job of bagging groceries, and Williams stayed with him every day for one week, attempting to demonstrate to him the proper method for bagging the groceries. However, without constant supervision, appellant was unable to perform the job correctly. Williams stated that appellant never understood the procedures for clocking in and clocking out on a break, but that he did know he was supposed to receive payment for his work and knew when payday was.

Speaks–Trujillo, who testified briefly, indicated that Vernon was a recognized expert in the field of psychology and deafness, but that Estess and Tanay, the state's expert witnesses, were not.

The state began by putting on Jane Dobecki, who taught interpreting at Columbus State Community College and had functioned as a forensic interpreter more than three hundred times, although she is not a certified interpreter. She interpreted for Estess when he examined appellant. Dobecki stated her opinion that she was able to communicate effectively with appellant, understanding approximately ninety percent of appellant's sign language, and that Estess and appellant carried on a meaningful conversation. She stated that appellant was able to sign responses to almost all of Estess's questions.

Sally Monohan, a certified interpreter and counselor for St. Rita's School for the Deaf, again testified for the state. She had observed Estess and Dobecki communicating with appellant, and she expressed the opinion that the communication was effective. She indicated that appellant's communication skills were good, that his ability to relate events chronologically was good, and that he would, on occasion, correct or change an answer about the date of a certain event if other information occurred to him to change the sequencing of events. In her opinion, appellant had the ability to understand information given to him.

Dr. Michael Estess then testified for the state. Estess, a psychiatrist from Boise, Idaho, had some experience in working with the Department of Corrections in Idaho and had served as a consultant regarding treatment for inmates. He was a designated examiner for competency in Idaho. Estess met with appellant and reviewed appellant's school and medical records, previous competency evaluations, the taped interrogation with Officer Stricker, and police reports. He indicated that he also did some research on his own by discussing the issues with persons who knew sign language and with some friends of his who were psychologists.

Estess testified that appellant's communications were relevant and appropriate, and that there seemed to be "no problem" with appellant's ability to understand and respond. According to Estess, the problem was not whether appellant could communicate but his willingness to communicate. Appellant was capable of communicating on the many subjects discussed, including his sexual relations with females, stealing money from his mother and engaging in antisocial behavior with his friends.

Appellant would not, however, discuss the court proceedings. Estess stated that whenever he attempted to discuss the legal proceedings, appellant would state that he "[didn't] understand," the "police are against black people," and would repeat "I'm black. I'm deaf." In Estess's opinion, appellant was purposefully pretending not to understand the questions regarding his legal situation because he knew that such conduct would help him escape punishment for his deeds. Estess testified that appellant had a practiced ability to deceive persons in authority, and would lie when he knew that he had done something wrong. According to Estess, appellant had the ability to understand the nature of the proceedings against him and to assist in his defense.

The state also presented the testimony of Julius Thrasher, who was incarcerated in a cell or pod next to appellant for a few days. Thrasher agreed to testify at appellant's competency hearing in exchange for a change in the location of his incarceration to a place nearer his home and for the assistance of the Hamilton County Prosecutor's office in his attempt to obtain parole.

Thrasher indicated that appellant was able to communicate with him and other inmates by using simple sign language. He stated that he understood appellant's attempts to communicate and was able himself to communicate with him in sign. According to Thrasher, appellant had, in sign language, indicated that he had killed an elderly woman, and Thrasher told him to keep quiet and to pretend not to know anything about it when other people were around. When the interpreters at the hearing signed to appellant what Thrasher was saying, which was done by using a gesture indicating stabbing, appellant became agitated and mouthed the words "bullshit" and "not me." The words were audible, though garbled.

This was the only time in the competency hearing that appellant visibly or audibly reacted to testimony.

Finally, the state presented the evidence of Dr. Emmanual Tanay, a psychiatrist licensed in forensic psychiatry who had significant experience in evaluating defendants for competency to stand trial. Tanay reviewed appellant's medical and educational records, his criminal records, Estess's report, and the videotaped interrogation of appellant. Tanay found that appellant could communicate on a meaningful level, appropriately relating his personal history and indicating to Tanay that he had been tricked into making the statements on videotape and that he was innocent of the charged crime. Tanay stated that appellant repeatedly stated that he did not kill anyone, and he provided information to Tanay about trouble he had had with the law in the past.

Tanay emphatically stated that appellant, although intellectually impaired, was not retarded. Like Estess, Tanay found that appellant was "goal directed" in his responses to questions and knew it would be helpful to him to be deceptive. Tanay testified that appellant understood the concepts of blame and guilt and had the capacity to work and save his pay for entertainment, which showed appellant's ability to understand abstract concepts and acquire knowledge about complex activities.

Tanay stated that, in his opinion, appellant was malingering and was fully able to understand the nature of the proceedings against him and to participate in his defense. At the conclusion of the hearing, the trial judge found appellant competent to stand trial.

After reviewing the entire record (which is greatly condensed above), we hold that the trial court's decision finding appellant competent to stand trial was supported by competent, credible evidence. The court was presented with contradictory information; although Schmidtgoessling, Vernon and Everington stated that they had great difficulty in communicating with appellant and that he did not exhibit a comprehension of abstract concepts, Estess and Tanay stated that they were able to effectively communicate with appellant and were confident that appellant understood them but was purposefully malingering.

The experts differed as to whether appellant could relate events in a chronologically rational manner. Estess and Tanay stated that appellant demonstrated that he could relate events in proper chronological order from his childhood up to the time of his arrest. Schmidtgoessling, Vernon and Everington stated that appellant could not rationally relate time sequences and that he could not meaningfully distinguish questions regarding things that occurred two weeks earlier as opposed to two years earlier.

Even the interpreters differed as to the extent to which they were able to communicate with appellant and appellant's understanding of the questions presented to him. The testimony regarding whether appellant and Officer Stricker were effectively communicating was directly conflicting. In crediting the testimony of one expert or interpreter over another, the trial court had to make difficult credibility determinations.

A reviewing court gives these determinations great deference, because "the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. This court cannot simply substitute its judgment for that of the trial court, and we cannot say that the trial court lost its way in resolving conflicts in the testimony or created such a manifest miscarriage of justice that the decision should be overturned. See *State v. Otten* (1986), 33 Ohio App.3d 339, 515 N.E.2d 1009.

 Appellant points out, and this court notes, that Vernon and Everington are recognized experts in dealing with deaf and/or retarded individuals, whereas Estess and Tanay had little experience or training in dealing with retarded persons or deaf persons. However, the issue before the court was not whether appellant was retarded or to what extent; the court was required to determine whether appellant had the ability to understand the nature and objective of the proceedings against him and to assist in his defense. An expert's credentials may be a factor in a court's determination of the expert's credibility, see, *e.g., State v. Hart* (1994), 94 Ohio App.3d 665, 678, 641 N.E.2d 755, 763, but the judge was not *required* to credit the testimony of one expert over another based solely on credentials.

The experts agreed in many areas. It is undisputed that neither mild retardation nor deafness automatically renders a defendant incompetent to stand trial. Appellant did understand that he was accused of killing a woman, and that killing was wrong; he also indicated that he believed he had been coerced or tricked by the police. He indicated an understanding of guilt and innocence when he informed the examiners that he had not killed anyone as accused and when he referred to past instances when he had done something wrong.

He was capable of performing work (albeit simple tasks) for pay. The difficulties identified in his ability to clean were attributable to his inability to read, and he worked as a bagging clerk even after Williams ceased supervising him. Appellant gave conflicting responses to the same questions that were asked of him, and the conflicting answers could have been the result of deception or at least purposeful evasion.

Based on the evidence presented, we hold that competent, credible evidence supports the finding of the trial court that appellant was competent to stand trial. We do not believe that the trial court clearly lost its way in resolving conflicts in the testimony of the witnesses or created a manifest miscarriage of justice.

## FOURTH AND FIFTH ASSIGNMENTS OF ERROR

As indicated earlier, appellant was granted a new trial following the first trial, and, before the beginning of the second trial, a third competency hearing was held. The case had been reassigned from the original trial judge, so a different trial judge made the determination on the third competency hearing. Following the third hearing, appellant was again found competent to stand trial.

Appellant's fourth and fifth assignments of error attack this finding of competency. In his fourth assignment of error, appellant claims that the trial judge erred in finding appellant competent to stand trial without a demonstration by the state that appellant's condition had changed from the time of the initial determination of incompetency. We have held that a trial court is not prohibited from holding another competency hearing in the absence of a change in the defendant's condition. Thus, for the reasons stated above, we overrule appellant's fourth assignment of error.

Appellant's fifth assignment of error proposes that the trial court's determination of competency, following the third hearing on the issue, was erroneous. As stated above, the trial court's determination of appellant's competency will not be overturned if some competent, credible evidence supports the court's findings.

Testimony for the third determination of competency occurred on several different days in October and November 1994. All of the experts who examined appellant prior to the third hearing had the opportunity to discuss with appellant the circumstances and events of the first trial. Once again, the experts disagreed about the extent to which appellant understood the first trial or its outcome.

As before, Everington, Vernon and Schmidtgoessling testified that appellant was incompetent to stand trial, stating essentially the same reasons for their conclusions as they did in the second hearing. Tanay also testified, and his testimony was substantially the same as summarized above for the second hearing.

The state also presented the testimony of Dr. Glenn Weaver, who stated an opinion that appellant was competent to stand trial. However, Weaver's report indicated that he easily obtained a wide variety of information from appellant that was markedly different in substance, complexity and comprehensibility from the information obtained by Everington, Vernon, Schmidtgoessling *and* Tanay.

Therefore, the trial judge did not consider Weaver's opinion in making the determination of competency.

Our review of the second trial court's finding of competency is substantially the same as that for the first. Based on the information presented by Tanay, the trial court's resolution of the conflicts in the evidence, and the agreement of the experts in significant areas, we hold that the second trial court's finding of competency was supported by some competent, credible evidence.

Appellant's fourth and fifth assignments of error are overruled.

SIXTH ASSIGNMENT OF ERROR

■ Appellant argues in his sixth assignment of error that, in the third competency determination, the trial judge erroneously relied on her own observations and opinions of appellant in determining his competency. We overrule this assignment of error.

First, we note that the trial judge did refer to her own observations of appellant in making the determination of competency. However, the written opinion setting forth the reasons for the trial judge's conclusion of competency contains a review of all of the evidence presented by the experts and demonstrates that the court used the appropriate standards for determining competency. The opinion shows that the trial judge considered her observations of appellant's demeanor mainly to assist her in making credibility determinations. Thus, the trial judge did not base her entire finding of competency only on her observations of appellant. Cf. *Dusky v. United States* (1960), 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (trial court erred in finding defendant competent to stand trial based on court's opinion that defendant was oriented to time, place and people).

■ A trial court may use its own observations of a defendant's demeanor when applying the competency criteria, and as long as the court's finding is supported by some competent, credible evidence, the fact that the defendant's demeanor played a part in the court's decision is not reversible error. See, *e.g.*, *United States v. Hemsi* (C.A.2, 1990), 901 F.2d 293, 296; *McFadden v. United States* (C.A.3, 1987), 814 F.2d 144, 147.

Appellant's sixth assignment of error is overruled.

SEVENTH ASSIGNMENT OF ERROR

■ Appellant argues that the original trial court erred in overruling appellant's motion to record the competency evaluations by videotape. Appellant cites no case law supporting the argument that failure to permit the recording of competency evaluations constitutes reversible error.

Appellant indicates that having a videotape of the competency evaluations was necessary to "assure the accuracy of the sign language communications and, thus, the conclusions of each examiner." Appellant also argues that a videotape of the examinations would have revealed more of the problems in communication between appellant and the examiners.

The reasons advanced by appellant for videotaping the hearings are insufficient to invalidate the court's decision to refuse appellant's request. First, to the extent that appellant argues that the videotapes would have assisted the trial court in making the determination of appellant's communication skills and competency, we believe that the trial court had the discretion to reject the videotaping and rely instead on the testimony of the experts themselves about appellant's communication skills. We find no abuse of that discretion here.

Additionally, appellant seems to argue that videotaping the examinations would have enabled appellant to engage an interpreter to give an opinion as to the accuracy of the communications of the interpreters who assisted in the examinations. If appellant had put on an interpreter to interpret for the court what the interpreter at the examination had communicated, the state would have had to have been given the opportunity to put on its own expert interpreter to show that the interpreter at the examination had interpreted correctly, and appellant would have had to use another interpreter to testify that that interpreter was incorrect, and so on, *ad infinitum*. Such an inquiry borders on the metaphysical and is at best only collaterally related to the ultimate issue: appellant's ability to understand the nature and objective of the proceedings against him and to assist in his own defense.

We think it significant also that appellant did not claim that any of the facts that the state's examiners claimed were communicated to them through an interpreter (such as appellant's apparent involvement with the juvenile court and some other antisocial behavior) were false. Thus, appellant is left with claiming that the level of appellant's ability to communicate, and not the accuracy of the information conveyed by the interpreters, is paramount to his argument on appeal that failure to allow the videotaping is reversible error.

The interpreters who participated in the various examinations testified directly as to the relative difficulty that each had in communicating with appellant. As indicated earlier, the interpreters differed as to appellant's ability to communicate effectively through sign language. Appellant was free to, and did, cross-examine the interpreters as to their credentials and experience in interpreting, and the trial court ultimately had to make the factual determination regarding appellant's communication skills and how they affected his competency to stand trial. We hold that the trial court did not commit error by rejecting appellant's request to have the examinations videotaped.

### EIGHTH ASSIGNMENT OF ERROR

■ Appellant claims that the initial trial court erred in failing to permit appellant to videotape Julius Thrasher as he testified at the second competency hearing, when the court had already granted appellant's motion to permit video recording of the proceedings. Appellant claims that the error was prejudicial in part because Tanay relied on appellant's reaction to the information being conveyed by Thrasher to confirm his conclusion that appellant comprehended the proceedings and was competent to stand trial. The tape was played at the third competency hearing during Tanay's testimony.

We overrule this assignment of error. At the hearing in question, the video camera was at all times trained on appellant, not on any of the witnesses. Moreover, appellant was watching *not* Thrasher or any other witness but the interpreter during the testimony, and any reaction appellant may have had to Thrasher's testimony was in fact a reaction to what the interpreter was communicating or demonstrating. Thus, a videotape of Thrasher's testimony would be irrelevant to the issue of competency or to Tanay's and the trial court's conclusions about appellant's ability to comprehend the proceedings.[4] The trial court did not err in rejecting appellant's request to videotape Thrasher's testimony.

### NINTH ASSIGNMENT OF ERROR

Appellant argues that the second trial court erred in placing the burden of proof of appellant's competency on appellant after appellant had previously been found incompetent. We have already addressed this particular issue in connection with appellant's third assignment of error. For the reasons stated above, the ninth assignment of error is overruled.

### TENTH ASSIGNMENT OF ERROR

■ In the tenth assignment of error, appellant claims that the trial court erred in overruling appellant's motion to suppress his communications with the police immediately after his arrest. Appellant claims that the *Miranda* warnings were not properly conveyed to him in a clear and understandable manner.

■ When the trial court determines a motion to suppress, it "generally assumes the role of the trier of fact," and a reviewing court looks at whether the trial court's determination is supported by competent, credible evidence. See *State v. Rossiter* (1993), 88 Ohio App.3d 162, 623 N.E.2d 645; *State v. Brown* (1993), 91 Ohio App.3d 427, 632 N.E.2d 970.

---

4. Even if we assume that Tanay's opinion at the third hearing was based on a mistaken belief that appellant had reacted to the substance of Thrasher's testimony as opposed to the gestures of the interpreter, Tanay's remaining testimony regarding competency provided competent, credible evidence to support the trial court's conclusion.

As appellant notes, the trier of fact is to consider whether the totality of the circumstances surrounding the interrogation demonstrates that the defendant made an uncoerced choice in waiving his rights and had the "requisite level of comprehension" of the consequences of the decision to abandon these rights. See *Colorado v. Spring* (1987), 479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965; *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421; see, also, *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682. The requisite level of comprehension for a valid waiver of one's *Miranda* rights "does not require that a criminal suspect know and understand every possible consequence of a waiver of his Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 965.

In this case, the *Miranda* rights were communicated to appellant by Cincinnati Police Officer Brian Stricker, who used "pidgin" sign language (a method of signing that is a cross between signed English and American Sign Language and includes gestures and miming to communicate information). Because neither the prosecutor, defense counsel nor the trial court had any ability to understand the information being signed to appellant, the parties relied on the videotape of the exchange between appellant and Officer Stricker as well as testimony from numerous individuals familiar with sign language who had reviewed the videotape.

Several of the individuals familiar with pidgin sign language indicated that Officer Stricker's signing skills were average to poor, and that he failed in several instances to communicate the appropriate information to appellant. For instance, when Officer Stricker meant to sign "You have the right to remain silent," he actually signed "You *want* the right to remain silent." Some of the signs used by Officer Stricker were not recognizable by many of the individuals familiar with sign.

Finally, several experts in the area of deaf individuals stated that appellant's "yes" responses to Officer Stricker's questions about whether appellant understood the information being conveyed could not be relied upon as an indication that appellant actually understood the information. Many deaf individuals will respond in the positive when asked if they understand a communication, even if they do not, for fear of appearing slow or stupid. The most effective way to determine whether a deaf individual understands a communication is to ask that person to repeat the information back in his own words. Officer Stricker did not do this.

Officer Stricker testified that he believed that he and appellant were communicating effectively. He based this opinion on the fact that he had spent several hours during the day of the interrogation communicating with appellant on various topics and that appellant's responses were rational and appropriate.

698

Appellant uses a pidgin form of sign language to communicate, which is the same type of sign language with which Officer Stricker was familiar.

Other individuals familiar with sign language reviewed the videotape of the interrogation and stated opinions that the information conveyed by Officer Stricker's sign language was, although not perfect, comprehensible. They also indicated that appellant's demeanor indicated that he understood the information being conveyed to him and that his responses to Officer Stricker were appropriate. After each question, Officer Stricker would ask appellant to respond "yes" or "no," allowing appellant to deny or disaffirm any question or statement by Officer Stricker. Appellant answered "yes" to many questions but also indicated "no" to some questions, which supports the conclusion that he was not merely agreeing with everything Officer Stricker communicated.

Appellant's understanding of the information being given him by Officer Stricker was further demonstrated in the questions that Officer Stricker asked appellant regarding his possible involvement in the death of Thelma Beck. Appellant did not respond with simply "yes" or "no" answers, but provided information to open-ended questions that were appropriate to the questions asked. He also corrected his answers when he realized that he had not understood the question. At one point in the interrogation, appellant was asked whether he had engaged in sex with the victim, and, rather than simply responding "no," appellant stated that he had not, that the victim was old and he was young.

The trial court found that appellant had been effectively advised of his rights to refuse to answer questions and to have an attorney and had knowingly and voluntarily waived those rights. Again, the trial court was faced with contradictory conclusions regarding the information provided and the effectiveness of the communication with appellant. The trial court was forced to credit certain opinions over others and resolve these factual disputes. We hold that the trial court's decision was supported by competent, credible evidence. See *State v. Brown*, 91 Ohio App.3d 427, 632 N.E.2d 970. The videotape of the communication allowed the trial court to observe the demeanor of appellant and to assess the credibility of Officer Stricker's testimony. Several experts, citing specific exchanges on the tape, testified that appellant and Officer Stricker communicated effectively.

As stated above, a defendant need not know and understand every possible significance of the *Miranda* warnings. *Colorado v. Spring,* 479 U.S. at 574, 107 S.Ct. at 857, 93 L.Ed.2d at 965. Low intellectual functioning does not, by itself, show that a defendant lacks the ability to comprehend the warnings. See *State v. Hill* (1992), 64 Ohio St.3d 313, 595 N.E.2d 884 (low mental aptitude insufficient to show that waiver was not knowing and voluntary); *State v. Dailey*

(1990), 53 Ohio St.3d 88, 559 N.E.2d 459 (mildly retarded defendant with a first-grade reading level held capable of understanding *Miranda* warnings and waiver of rights); *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051 (defendant had appropriate comprehension even though he had a low IQ, and his reading ability was at a second-grade level).

Based on the finding that Officer Stricker effectively communicated with appellant, the trial court also had competent, credible evidence before it to determine that the substance of the information provided to appellant was sufficient to apprise him of his rights and the effect of waiver. The videotape demonstrates that Officer Stricker informed appellant that appellant could refuse to talk to the police and could stop the questioning any time after it had begun; that if he did talk to the police, the information would be used against him in court; and that appellant had the right to have an attorney with him for questioning and that if he could not pay for an attorney, the court would appoint one for him. This is all the warning that is required. See *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707.

We do not read appellant's assignment of error as alleging that the waiver was not voluntarily made, as there is no allegation (or evidence) of police coercion or intimidation. Therefore, we conclude that the trial court did not err in denying appellant's motion to suppress the statement he made to the police.

ELEVENTH AND TWELFTH ASSIGNMENTS OF ERROR

██ In his final two assignments of error, appellant argues that the trial court committed reversible error by refusing to declare a mistrial when the court and appellant learned that the state had withheld certain evidence, and that the trial court committed error in rejecting an exhibit offered by appellant.

In *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900, 902, the Ohio Supreme Court set out the standard of review of a trial court's decision to overrule a motion for mistrial. In that case, the court held:

"In evaluating whether declaration of a mistrial was proper in a particular case, * * * [t]his court has * * * adopted an approach which grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his courtroom warrants the declaration of a mistrial." *Id.*

██ An appellate court will not disturb the trial court's exercise of discretion absent a showing that the accused has suffered material prejudice. *State v. Sage* (1987), 31 Ohio St.3d 173, 182, 31 OBR 375, 382, 510 N.E.2d 343, 350; *State v. Long* (1978), 53 Ohio St.2d 91, 98, 7 O.O.3d 178, 182, 372 N.E.2d 804, 808.

In this case, the state undoubtedly withheld material evidence from appellant during the trial proceedings. The state had in its possession from the start of the case two fingerprint lifts which were identified as appellant's fingerprints. Although providing appellant with one of the lifts, the state did not provide the other to appellant. It was this second lift which, at the second trial, was alleged by the state's fingerprint expert to pinpoint appellant's presence in the victim's apartment to within twenty-four hours of when the lift was taken. Previously, the testimony regarding fingerprints had been inconclusive as to the exact time that the prints were made.

The state's conduct in withholding the evidence can be neither justified nor condoned in this case, particularly when the information concerning the alleged second fingerprint lift had existed from the beginning of the case and was not provided to appellant until after the information had already been testified to by the state's fingerprint expert in appellant's *second* trial. The trial court properly decided to exclude the second fingerprint lift (although not the testimony concerning it) from evidence.

Appellant claims on appeal that the information about which the state's fingerprint expert testified, which had been withheld from appellant, was so prejudicial that a mistrial was warranted. We disagree. Declaring a mistrial is an extreme sanction. The trial court has great discretion in determining the resolution of discovery disputes and determining the necessary precautions that must be taken to avoid prejudice to the defendant.

In this case, the court ruled that the second fingerprint lift could not be placed into evidence. Further, on cross-examination of the fingerprint expert, appellant's counsel was able to obtain an admission from the expert that he could not, in fact, pinpoint the age of the fingerprint by the second lift and could not actually know how long the fingerprint existed before the lift was taken.

Appellant also introduced his own fingerprint expert, an expert from the same office as the state's expert, who went with the police to the crime scene immediately after the crime occurred. That expert stated emphatically that the age of the fingerprint could not be pinpointed to hours or even days. Because of all of the variables that go into the determination of how old a print is, it would be impossible to know merely from the fact that a second lift had been taken how long the print had been on the material.

Thus, appellant's counsel's skillful cross-examination, her ability to force the fingerprint expert to admit that he could not in fact pinpoint the age of the fingerprint, the testimony of a colleague of the state's expert that refuted the earlier testimony and the trial court's exclusion of the fingerprint lift as an exhibit mitigated substantially, if not completely, any prejudice to appellant due

to the conduct of the state. We therefore overrule appellant's eleventh assignment of error.

 Finally, we find that the twelfth assignment of error is also without merit. The trial court rejected defendant's offer of an exhibit, which was a letter appellant had written to his mother. The trial court held that the letter was hearsay, while appellant argues that the letter was not submitted to show the truth of the matter asserted therein but to rebut an accusation that appellant had feigned illiteracy because he thought it would help him at his trial.

 Evidentiary rulings are within the broad discretion of the trial court, and an erroneous ruling will justify reversal on appeal only when the court commits an abuse of discretion that amounts to prejudicial error. *State v. Sage*, 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. Here, appellant may be correct that the letter was not hearsay and was in fact admissible. However, appellant has not demonstrated that the trial court's decision gave rise to any prejudice.

We are aware that the jury in this trial, during deliberations, requested a copy of the letter, which had been testified to previously. The question from the jurors indicates that they believed that they were missing an exhibit, but does not demonstrate that the jurors placed any kind of special evidentiary value or weight on the document. Moreover, appellant's mother had testified regarding the letter, which she stated she could not understand because of her son's inability to communicate in writing.

Any error in failing to allow the exhibit into evidence was not prejudicial and does not require a reversal of the case.

CONCLUSION

For all of the foregoing reasons, all of appellant's assignments of error are overruled. We affirm the judgment of the trial court.

*Judgment affirmed.*

MARIANNA BROWN BETTMAN, P.J., and DOAN, J., concur.