OPINION
{¶ 1} The State of Ohio appeals from the judgment of the Darke County Common Pleas Court wherein the court dismissed the indictment charging Bobby J. Burnett of operating a motor vehicle while under the influence of alcohol having been convicted of three or more prior similar offenses.
 {¶ 2} Burnett was indicted on March 31, 2003. On October 14, 2003, Burnett's counsel moved the court to conduct a competency evaluation of Burnett because Burnett is a deaf mute with whom counsel has serious difficulty communicating. Specifically, counsel stated that Burnett communicates with hand gestures and the two sign language interpreters disagree as to what Burnett is trying to communicate to counsel.
 {¶ 3} At the competency hearing, defense counsel called Sandra Castle, a social worker at Community Services for the Deaf in Dayton as a witness. Ms. Castle stated she possessed a bachelor's degree in social work from Wright State University and a Masters degree in Rehabilitation Counseling for severe disabilities from Wright State as well as an associate's degree in Manual Communication (sign language). She also stated she had a level four certification out of five from the National Associates of the Deaf. The prosecutor objected to Ms. Castle testifying concerning Burnett's competency because he asserted she didn't meet the definition of an "examiner" under R.C. 2945.37. The trial court overruled the objection.
 {¶ 4} Ms. Castle testified she had worked with Burnett as a social worker prior to his indictment, helping with his living situation and looking for a job. Ms. Castle testified she discussed the facts surrounding Burnett's indictment with him. She testified as follows:
 {¶ 5} "A. It's very slow going getting the information from Bobby. First of all, we have the issue of establishing a time frame when we're talking about something today or that happened a while ago. The timing of when things occurred gets kind of confusing and we would have to stop and back up and ask questions several times to try to get a feel if we were getting through to Bob so that he was understanding specifically what you were asking.
 {¶ 6} "Q. Okay. What is the source of the problem in the communication?
 {¶ 7} "A. In my opinion, the source of the problem is that Bobby has a variety of communication styles that he's using. He's not fully accessing American Sign Language although he's using some formal American Sign Language signs, as well as gestures as well as what we would call home signing. There is the sign language he's established with family members. Some family members know more of that home signing than other family members. So it depends on which family member is available at the time for how much information we're gathering from that family member as far as what his sign is.
 {¶ 8} "Bobby's very concrete and his understanding of things are here it can be seen and pointed to and touched and dealt with in a real concrete manner. It's fairly easy to get the information across. The further away you get from that, the harder it is to get a real good feel for whether or not you're getting through.
 {¶ 9} "Q. Okay. If I could summarize what you said, is it true that his communication involves three different methods of signing, the standard American Sign Language, gestures, and then something he's invented through his family?
 {¶ 10} "A. Correct.
 {¶ 11} "Q. Okay. What is his ability with regard to American Sign Language? I know you discussed that a little bit.
 {¶ 12} "A. Bobby uses some American Sign Language and it's — you can't piece apart. His language style has all three of those components in it. You'd have to videotape him and breakdown which part of it is sign language, which part is gestures, which part is American Sign Language. But he tends to use this a lot more than the traditional signs. So it's kind of hard to answer.
 {¶ 13} "Q. Okay. During the meetings we have, has any single person taken the lead among you, Mrs. King and Bobby's sister, or have all of you been involved in the translation?
 {¶ 14} "A. All three of us.
 {¶ 15} "Q. Okay. When all three of you are involved in the translation, are there instances where the three of you have different interpretations of what Bobby has said?
 {¶ 16} "A. Yes.
 {¶ 17} "Q. Okay. Can any of the three of you be certain as to what Bobby has said or you just giving it your best interpretation you can?
 {¶ 18} "A. We're giving it our best interpretation we can.
 {¶ 19} "Q. With regard to a trial in this case, do you think given Bobby's current communication abilities that he would be able to assist in his defense?
 {¶ 20} "MR. GREEN: Objection. This witness does not meet the definition of examiner in 2945.37 and therefore cannot give an opinion on that subject."
 {¶ 21} The trial court overruled the prosecutor's objection and noted that the court would allow the witness to testify about Burnett's communication skills and ability to understand and participate on his defense. (Tr. 12).
 {¶ 22} Ms. Castle testified she thought it would be difficult for Burnett to assist in his own defense because he would need several people interpreting for him and he would need clarification throughout the proceedings to make sure he was understanding the testimony. (Tr. 14). Ms. Castle testified further on direct examination:
 {¶ 23} "A. Is it likely that Bobby would become confused and/or shake his head yes when he's not completely understanding a question and lead the interpreter to believe he answered yes when he didn't really understand, yes. I believe that could happen on a trial.
 {¶ 24} "Q. If I call on Bobby to testify on his own behalf, how difficult would it be for me to communicate with him as to how to testify and what mannerisms to have and I'd have to restrain him on facts and all those sorts of issues?
 {¶ 25} "A. Restraining on the facts would be very difficult. Bobby will start to tell the story the way it happened and he will run from A to Z with the story and be very difficult to stop the story as it's going and ask him to only focus in on certain aspects of that."
 {¶ 26} On cross-examination, Ms. Castle conceded that Burnett understood that he was charged with "driving and drinking" and that he could go to jail for having done so. She testified she explained the penalties Burnett faced to him and he seemed to understand to some degree. She conceded that Burnett was able to hold down a job with support of his family, and that he lives on his own also with that support.
 {¶ 27} Ms. Castle testified she believed Burnett could pick up the details of the trial by slowing things down but the overall concept of the trial would be difficult for him to understand. (Tr. 25). In short, Ms. Castle testified she did not believe that Burnett was capable of understanding parts of the proceedings. (Tr. 27). Ms. Castle did not specify what portions of a trial Burnett would not understand.
 {¶ 28} The trial court asked Burnett through his interpretater to explain why he was in court. The following occurred:
 {¶ 29} "THE COURT: Mr. Burnett, tell me why you are here today.
 {¶ 30} "THE INTERPRETER: Keys. Gave them to a friend to drive. I said no, no, no.
 {¶ 31} "MR. ASLINGER: Your Honor —
 {¶ 32} "THE COURT: No. Finish the answer.
 {¶ 33} "THE INTERPRETER: Go ahead. Now, put the seat belt on, pulled it, couldn't get it off. Broke seat belt off. It was broke. Pulled out. Couldn't get in. Fast. A light. No, the sun. The sun. And I was hitting the person beside me and I put my hand over my head. Person took the steering wheel. The tire blew, the air went out. Blew a tire. I fell, hit my nose, my face and blood coming down.
 {¶ 34} "Wait a minute. Wait a minute. Wait a minute. Wait a minute. I don't understand. First person? Man here? Man to my right. No, I'm sorry. Man to my left. Sorry. Man to my left fell over, hit my nose. Hit my lip and nose, got dizzy. Person took off. I don't know. I looked. I couldn't focus, couldn't open door. Couldn't — I don't know. And I tried to unlock. Couldn't get — took off the seatbelt, grabbed the steering wheel, climbed over driver's side and went out.
 {¶ 35} "Flagged down someone. Semi driver took me, saw — wait, wait, wait. Saw — wait. No, no. Wait, wait. I don't understand. Wait a minute. Saw semi driver and I was bleeding down my face. Saw the semi driver. He told me to come in. He opened the door, pulled me and as I was coming in, I was shaking, blood coming down everywhere. Wait, wait, wait.
 {¶ 36} "Semi driver took you to friend, to a house. I told him to stop. Said thank you and I went out and then I — bloody. I knocked on the door and a boy that was a friend talked and then I passed out. The blood everywhere from my nose. It was just blood gushing everywhere. Boy took off. Didn't see him where he is. He took off. He's gone. I don't — I don't know.
 {¶ 37} "THE COURT: Thank you, Mr. Burnett. Mrs. King, would you tell me, please, what question you asked Mr. Burnett? I gave you a question.
 {¶ 38} "THE INTERPRETER: You asked do you know why you are here today.
 {¶ 39} "THE COURT: Is that what you asked Mr. Burnett?
 {¶ 40} "THE INTERPRETER: Yes. That's what I asked.
 {¶ 41} "MR. GREEN: Your Honor, if I may. It was obvious that he didn't understand the question when it was asked so the correct answer would have been to stop him at that point and ask him again until he did understand.
 {¶ 42} "THE COURT: Was there something difficult about the question?
 {¶ 43} "MR. GREEN: No, your Honor, but from the answer it was obvious that he misunderstood. He's for the DUI to tell his side of the story and that's what he started to do."
 {¶ 44} The trial court found that Burnett's deaf condition and his inability to communicate were so severe that he was incapable of understanding the nature of the proceedings against him and he was unable to assist in his own defense.
 {¶ 45} In making this finding, the trial court noted that Ms. Castle had testified that Burnett's communication skills through sign language were extremely low functioning. The court noted that Ms. Castle described the most effective method of communicating with Burnett was through the use of a "string" of translations and even then the three translations could not agree on the extent of Burnett's comprehension nor the substance of his responses. The court noted that Ms. Castle believed that Burnett was unable to relate events in an appropriate time sequence, was unable to meaningfully communicate with his attorney and that he would volunteer information whether solicited by counsel or not. The court also noted that Ms. Castle believed the legal proceedings were too abstract for Burnett to understand. Finally, the court observed:
 {¶ 46} "After the testimony of Ms. Castle, which lasted approximately 40 minutes, the Court questioned Mr. Burnett about the purpose of the hearing and why he was in Court that day. Mr. Burnett responded by giving a rambling explanation of the facts concerning his arrest and tried to deny any criminal liability. During his response, he at times corrected him and at other times repeated his answers but inconsistent with his first response. The Defendant demonstrated an inability to explain correct time sequences. It was clear from observing both the translator and the Defendant that clarification was regularly occurring between the Defendant and the translator. Obviously, the translator was laboring in trying to discern the meaning of the Defendant's signs and sounds. Clearly, there was a significant inability to communicate with the Court's translator. From this questioning, the Court was able to observe the defendant's extremely poor responsiveness and inability to answer a simple question. Indeed, he never responded that the purpose of the hearing was to determine the extent of his ability to communicate and its impact on his ability to understand the nature of the proceeding against him and to assist in his own defense."
 {¶ 47} Three months after the court concluded that Burnett was not competent to stand trial, the court determined that there were no cognitive learning programs to eliminate Burnett's incompetency. The court having determined that Burnett could not be restored to competency in the foreseeable future ordered the indictment dismissed and Burnett discharged.
 {¶ 48} In a single assignment of error, the State contends the trial court erred in finding Burnett incompetent to stand trial when no evidence was ever presented that a qualified examiner conducted a competency evaluation of Burnett pursuant to R.C. 2945.37.
 {¶ 49} R.C. 2945.37(B) provides that the court shall conduct a hearing when the competency of a defendant is raised before trial. R.C. 2945.37(c) provides as follows:
 {¶ 50} "(C) The court shall conduct the hearing required or authorized under division (B) of this section within thirty days after the issue is raised, unless the defendant has been referred for evaluation in which case the court shall conduct the hearing within ten days after the filing of the report of the evaluation or, in the case of a defendant who is ordered by the court pursuant to division (H) of section 2945.371
[2945.37.1] of the Revised Code to undergo a separate mental retardation evaluation conducted by a psychologist designated by the director of mental retardation and developmental disabilities, within ten days after the filing of the report of the separate mental retardation evaluation under that division. A hearing may be continued for good cause."
 {¶ 51} The plain influence of R.C. 2945.37(C) is that the court is not required to refer a defendant for an evaluation when the issue of the defendant's competency to stand trial is raised. See, State v. Bailey
(1992), 90 Ohio App.2d 58, 66. Indeed, R.C. 2945.37(A) provides that either the prosecuting attorney or defense counsel "may" present evidence as to the defendant's competency at the hearing.
 {¶ 52} R.C. 2945.371(A) provides as follows:
 {¶ 53} "(A) If the issue of a defendant's competence to stand trial is raised or if a defendant enters a plea of not guilty by reason of insanity, the court may order one or more evaluations of the defendant's present mental condition or, in the case of a plea of not guilty by reason of insanity, of the defendant's mental condition at the time of the offense charged. An examiner shall conduct the evaluation." (Emphasis added).
 {¶ 54} The plain meaning of R.C. 2945.371(A) is that if the trial court orders the defendant evaluated for competency, an "examiner" must conduct the evaluation. R.C. 2947.37(A)(2)(a) provides that an "examiner" means either of the following:
 {¶ 55} "(a) A psychiatrist or a licensed clinical psychologist who satisfies the criteria of division (I)(1) of section 5122.01 of the Revised Code or is employed by a certified forensic center designated by the department of mental health to conduct examinations or evaluations."
 {¶ 56} In this matter, Burnett's counsel sought a competency "evaluation" because he contended Burnett was not competent to assist in his own defense. The trial court on October 15, 2003 set the matter for a hearing without ordering that Burnett be evaluated as contemplated by R.C. 2945.371. The court noted that the "facts concerning the motion were previously presented in chambers with the participants of counsel and with the interpreters used by the court and the defendant for his treatment and education programs." The court notified the parties that requests for "additional testimony by either party should be filed by October 31, 2003." On October 17, 2003, the State requested that a competency hearing be conducted but never requested that Burnett be evaluated by a qualified examiner.
 {¶ 57} The defendant, who bore the burden of demonstrating his incompetency, resented the testimony of Ms. Castle, who is not a qualified examiner but who is very experienced in dealing with the hearing impaired. In reviewing a trial court's determination of competency, appellate courts look to see whether the trial court's conclusion was supported by competent, credible evidence. State v.Williams (1986), 23 Ohio St.2d 16. The trial court may consider an expert's credentials when determining the expert's credibility. State v.Stanley (1997), 121 Ohio App.3d 673. The court may also rely upon its own observations of the defendant, provided that the trial court has other competent credible evidence upon which to rely. Id. At 694. In this matter, there was evidence to support the trial court's observation of the defendant's competency.
 {¶ 58} The State never requested that Burnett be "evaluated" by a qualified examiner although it knew Burnett was proceeding on his motion without such an examination being conducted. Having concluded the court is not required to conduct a competency evaluation in every instance, we must conclude that the State's assignment is without merit.
 {¶ 59} There is no evidence in this appellate record whether the prosecutor filed an affidavit in the probate court for the civil commitment of Burnett in the manner provided by Chapter 5122 or 5123 of the Revised Code. The trial court may retain jurisdiction over the defendant if, after a hearing, the court finds the defendant committed the offense with which he is charged and the defendant is a "mentally ill" person subject to hospitalization by court order or a mentally retarded person subject to institutionalization by court order. See, R.C. 2945.39(A)(2).
 {¶ 60} Since there was no evidence presented at the competency hearing that Burnett is "mentally ill" as defined by R.C. 5122.01(A), there appears to be little likelihood Burnett could be subject to involuntary civil commitment. There was also no evidence that Burnett is mentally retarded.
 {¶ 61} We agree with the prosecutor that Burnett represents a serious safety risk to the community if he continues to operate a motor vehicle while under the influence of alcohol. The prosecutor represented in his brief that Burnett has eight prior convictions for driving while under the influence of alcohol. It appears that this was the first time his competency to stand trial because of his serious communicative problems was raised. We understand the frustration of the State in dealing with Burnett's conduct, but due process concerns must always be addressed when they are brought to the attention of a court of law.
 {¶ 62} The assignment of error must be overruled. The judgment of the trial court is Affirmed.
Young, J., concurs.